**PAGEL et al. v. PUMPHREY et al.**

No. 11715.

Court of Civil Appeals of Texas.
San Antonio.

June 4, 1947.

Rehearing Denied June 25, 1947.

Lawler & Childress, of Houston, and Willson & Hargrove, of Cotulla, for appellants.

O. R. Armstrong and C. D. Bates, both of Cotulla, for appellees.

MURRAY, Justice.

This is an appeal from a judgment in nineteen consolidated trespass to try title suits wherein appellees recovered from appellants an undivided one-third mineral interest in approximately 10,000 acres of land, under nineteen separate ownerships, situated in La Salle County, Texas. The trial was before the court without a jury. The appellees are the heirs or assigns of one Andrew Armstrong, Sr., and appellants are the assigns of Alexander J. Uhl, Jr., and Henry Caley.

By written stipulation the parties agreed:

"(1) That Andrew Armstrong, Sr., is the common source of title;

"(2) That plaintiffs are the sole surviving heirs of Andrew Armstrong, Sr.;

"(3) That the only interest plaintiffs claim in the lands described in their several petitions herein is the undivided one-third mineral interest excepted and reserved in a deed dated April 17, 1901, from Andrew Armstrong, Sr., to Henry Caley and Alexander J. Uhl, Jr., conveying 18,020 acres of land, including the tracts here in controversy, and that plaintiffs do not otherwise contest or question the validity or regularity of the title of defendants to the several tracts of land described in plaintiffs' petitions;

"(4) That the title to the several tracts of land described in plaintiffs' petitions passed to the several defendants by a regular chain of duly recorded conveyancees and other muniments of title from and under Henry Caley and Alexander J. Uhl, Jr., the grantees in the aforesaid deed, subject only to the claim of plaintiffs to to the one-third mineral interest excepted and reserved by Andrew Armstrong, Sr., under the terms of that deed;

"(5) That the 19 suits should be consolidated for trial."

Appellants concede that under a deed of April 17, 1901, from Andrew Armstrong, Sr., to Henry Caley and Alexander J. Uhl, Jr., Andrew Armstrong, Sr., effectively excepted and reserved an undivided one-third mineral interest in the lands conveyed thereby. The controlling question presented on the appeal is whether appellants and their predecessors in title thereafter acquired the title to that mineral interest, either (1) by voluntary relinquishment thereof by Andrew Armstrong, Sr., or (2) by operation of the statutes of limitation.

Appellants contend that on April 18, 1903, by a legally sufficient instrument, the reserved mineral interest was relinquished and quitclaimed by Andrew Armstrong, Sr., to appellants' predecessors in title, as provided by the terms of an alleged prior parol agreement to that effect; but, in the alternative, if the instrument which was executed in performance of the alleged parol agreement did not have the legal effect of relinquishing such interest, then appellants claim the superior equitable title thereto by reason of a full and complete performance of the terms of such contract by their predecessors in title.

Appellants further contend that the one-third mineral interest was relinquished by a deed and assignment dated April 28, 1903, from Andrew Armstrong, Sr., to H. P. Drought & Company, and a subsequent release and quitclaim deed, dated November 28, 1905, from H. P. Drought & Company to appellants' predecessors in title. Lastly, appellants assert title to such mineral interest under the statutes of limitation.

A decision of this appeal will turn upon (1) the construction of the aforesaid instruments, (2) the admissibility of and the legal effect to be given to evidence of certain transactions between predecessors in title of appellees and appellants, which preceded and followed the execution of such instruments, and (3) the legal effect of alleged acts of adverse possession of appellants and their predecessors in title.

The instruments above referred to have been discussed and their effect construed in an opinion by the El Paso Court of Civil Appeals styled Armstrong et al. v. Humble Oil & Refining Co. et al., reported in 145 S.W.2d, beginning at page 692. There it was held that these instruments were not sufficient to relinquish the undivided one-third mineral interest theretofore excepted and reserved by Andrew Armstrong, Sr., in the deed from himself to Caley and Uhl, Jr., dated April 17, 1901.

It might be well to here set forth chronologically all the facts concerning these transactions. On April 17, 1901, Andrew Armstrong, Sr., was the owner of 18020 acres of land situated in La Salle County, Texas. He borrowed the sum of $10,800 from M. J. Barlow & Company, giving his note therefor and a deed of trust upon the north 9081 acres of the above tract of land to secure the payment of this note. On the same day he sold to Caley and Uhl, Jr., the entire 18020 acre tract in consideration of a cash payment of $5,000, the assumption by the grantees of the $10,800 note in favor of M. J. Barlow & Company, and the execution of six promissory notes each in the sum of $4,124.50. A vendor's lien was retained to secure the payment of the assumed Barlow & Company note, as well as the six purchase money notes. In this conveyance Armstrong, Sr., reserved to himself an undivided one-third mineral interest out of the entire tract conveyed to Caley and Uhl, Jr.

On July 1, 1901, Armstrong, Sr., borrowed $10,800 from H. P. Drought & Company, and to secure his note in that amount pledged the six promissory notes executed and delivered to him by Caley and Uhl, Jr. Caley conveyed his interest in the land to C. A. Goeth and Chas. Duessen, who did not assume the payment of the Barlow note, but took the property subject to this note. The Lockwood National Bank of San Antonio ultimately became the owner of the Barlow note.

On April 18, 1903, Uhl, Jr., C. A. Goeth and Chas. Duessen paid to the Lockwood National Bank the $10,800 note and a release and quit-claim was executed by

Lockwood National Bank and Armstrong, Sr. It is claimed by appellants that by this instrument Armstrong, Sr., relinquished his reserved one-third interest in the minerals.

On April 28, 1903, Armstrong, Sr., for the total consideration of $20,409.90, sold and assigned to Drought & Company the six Caley and Uhl, Jr. notes, together with the vendor's lien and superior title securing their payment. It is also contended that by this assignment Armstrong, Sr., divested himself of the reserved one-third mineral interest.

On November 28, 1905, H. P. Drought & Company released and quit-claimed to Caley and Uhl, Jr., and C. A. Goeth and Chas. Duessen, as assignees of Caley, the vendor's lien and superior title securing the payment of the six notes. The consideration of this release and quit-claim was the payment of these notes by Uhl, Jr., and C. A. Goeth and Chas. Duessen.

As showing the attending circumstances surrounding the execution of these instruments, C. A. Goeth gave certain oral testimony which was first received by the trial court, over the objection of appellees, but later stricken from the record. The testimony was as follows, to-wit:

"Q. Prior to the time the Barlow & Company note was paid did you ever have any discussions with any one here representing Lockwood National Bank regarding that note or its payment? A. I had a discussion with Mr. A. J. Lockwood, President of the Bank.

"Q. What was the substance of that discussion? A. I told Mr. Lockwood that I had acquired an undivided one-quarter interest in the ranch, but that—I want to say here that the Lockwood National Bank was the holder of the note at that time from Barlow, the note had been transferred by Barlow & Company to the Lockwood National Bank. As previously stated, I told Mr. Lockwood that I had acquired a one-quarter interest in the land, very little had been paid on the land, and there was an outstanding mineral interest in Mr. Armstrong. That there was an outstanding mineral interest in favor of Andrew Armstrong, Sr., which might not be advantageous in the handling of the ranch,

the sale of it, that I did not like the ranch as well as I thought I would, that the land, particularly along the river, was not nearly as good as I thought it was when I bought the ranch, the lands along the north side of the river were not suited for irrigation purposes, as I thought they were, and that money could be made on the ranch in subdividing the land along the Neuces River, dividing it out and selling it to irrigation farmers. In fact we have gotten a release on 735 acres, approximately that, and put it into irrigation, and Mr. Uhl took one-half of that land, approximately one-half of the land and Duessen and Goeth the other half. I told Mr. Lockwood if Andrew Armstrong, Sr., would relinquish his mineral interest— that we would arrange to pay off that note if Mr. Armstrong would release that interest to us. Mr. Lockwood, I think he knew as well as I did, that Judge C. C. Clamp was attorney for Andrew Armstrong, Sr., he said the would take it up either with Mr. Armstrong or Mr. Clamp, C. C. Clamp. That is the substance of the conversation between Mr. Lockwood and myself.

"Q. Thereafter did you hear either from Andrew Armstrong, Sr., or Judge Clamp about the matter? A. The next time I heard about it was very shortly afterwards. Judge C. C. Clamp called me and said that Mr. Armstrong was very desirous of having that note paid and he would relinquish his mineral interest in the land if we paid the note.

"Q. Did Judge Clamp tell you why Mr. Armstrong was interested in getting the Barlow note paid? A. He told me that Mr. Armstrong, Sr., was desirous of selling the remaining notes and if we paid this note, the Barlow note, he could sell the notes that we had given in payment, those vendor's lien notes, to Drought & Company.

"Q. That is H. P. Drought & Company? A. Yes, sir. That he would relinquish that mineral interest, his mineral interest.

"Q. Did Judge Clamp tell you at that time anything about H. P. Drought holding those notes under some collateral assignment from Mr. Armstrong? A. No, I don't think he did at that time. Later

on we paid the notes to the Lockwood National Bank. What was your question again?

"A. No, I don't think he told me right then.

"Q. Do you recall whether you knew that from any other scource at that time? A. Not at that time.

"Q. Did you, Mr. Duessen and Mr. Uhl thereafter pay the Barlow note to the Lockwood National Bank? A. We did, after Judge Clamp said he would get up a release, a relinquishment of Armstrong's interest in the land, of the interest he had to the land, including the mineral interest; of course that was the main subject of the discussion.

"Q. Did you at that time, at the time you paid the note, get a release from the Lockwood National Bank and from Mr. Armstrong? A. We did, we got what we considered a relinquishment of his interest in the minerals.

"Q. With reference to the collateral assignment from Andrew Armstrong, Sr., to H. P. Drought & Company have you seen the original copy of that instrument? A. Assigning the notes as collateral?

"Q. Yes, sir. A. Yes, sir.

"Q. Where is that original instrument at this time if you know? A. I have got it here now in my hand.

"Q. About what time, that is the day, month and year, if you can tell me, was the Barlow note paid to the Lockwood National Bank and the release obtained? A. The note was due April 17, 1903. I believe the release is dated the 18th, I don't think the release was there on the 17th.

"Q. Do you recall when you paid the note? A. We paid it soon after, a few days after.

"Q. A few days after it became due? A. Yes, sir. As soon as the release was there, as soon as Lockwood advised us that this release and quit-claim to the minerals was there at the bank we paid it.

"Q. Now, in that transaction with the Lockwood National Bank and Judge Clamp, did either Mr. Duessen or Mr. Uhl have any personal contact with Judge Clamp or the bank, or did you handle the whole thing for them as well as for yourself? A. I think I handled it.

"Q. You think you handled the whole thing? A. I think so. I am satisfied I did.

"Q. Well, is it the best of your recollection that you alone handled the transaction? A. I did.

"Q. Judge Goeth, except for the representation that was made to you by Judge Clamp, that if the Barlow note was paid by you fellows that Mr. Armstrong would convey or relinquish all of his mineral interest, would you have paid that note? A. No, we would not.

*   *   *   *   *   *

"Q. Judge Goeth, after the Barlow notes were paid off did you, Mr. Duessen and Mr. Uhl claim to own the entire mineral interest in the land? A. We certainly did."

This testimony was offered for the purpose of showing that Armstrong, Sr., was under an obligation to convey to Uhl, Jr., C. A. Goeth and Chas. Duessen his reserved mineral interest and that the consideration for such obligation to convey was the payment of the Barlow & Company note by Uhl, Goeth and Duessen when Goeth and Duessen had not assumed such payment. The El Paso Court of Civil Appeals had held in Armstrong v. Humble Oil & Refining Co., Tex.Civ.App., 145 S.W.2d 692, 697, that there was no evidence of any contract or obligation on the part of Armstrong, Sr., to convey such mineral interest and no consideration for him to do so.

▇▇▇ Appellants insist that the trial court committed error when he struck this testimony from the record. We have concluded that the testimony was properly excluded. The evidence is not that Andrew Armstrong, Sr., made any agreement to convey his reserved mineral interest, but that C. C. Clamp made such agreement for him. Before this agreement could be binding upon Armstrong, Sr., in any way, it would have to be shown that Armstrong, Sr., authorized Clamp to make such a contract for him, or that he ratified the same with full knowledge of what had transpired between Clamp and Goeth. The only direct testimony tending in any way to show that

Clamp was authorized to make such agreement for Armstrong, Sr., was the statement by Goeth to the effect that Clamp was attorney for Armstrong, Sr. We cannot presume that by this statement Goeth meant that Clamp was an attorney-in-fact for Armstrong, Sr., with full authority to make contracts to convey real estate, but merely that Clamp represented Armstrong, Sr., as an attorney-at-law. There is no presumption that an attorney-at-law has authority to bind his client to convey real estate, and when such authority is asserted the burden is upon the person so asserting to allege and prove such authority. 7 C.J.S. Attorney and Client, § 76, page 888; Armstrong v. Gaddis, 135 Tex. 580, 144 S.W.2d 539; American Nat. Ins. Co. v. Savage, Tex.Civ.App., 112 S.W.2d 240; Noska v. Mills, Tex.Civ.App., 141 S.W.2d 429; Klein v. Buchoz, Tex.Civ.App., 183 S.W.2d 285, affirmed 143 Tex. 284, 184 S.W. 2d 271; Planters' Mfg. Co. v. Greenwood Agency Co., 168 Miss. 892, 152 So. 476; McFarland's Adm'r. v. McFarland, 235 Ky. 283, 30 S.W.2d 958; West v. A. F. Messick Grocery Co., 138 N.C. 166, 50 S.E. 565; J. D. Halstead Lumber Co. v. Hartford, etc., Co., 38 Ariz. 228, 298 P. 925.

■ It is true, as contended by appellants, that when an attorney is employed to represent a client in a lawsuit he is presumed to have authority to enter his client's appearance in the case and do many other things necessary to the trial of the case. 7 C.J.S., Attorney and Client, § 81, page 902. But the rule is quite different when it comes to contracting to convey or conveying real estate. Even an oral authority to convey real estate is void as violating the statute of frauds. Art. 3995, § 4, Vernon's Annotated Civ.Stats.; Kearby v. Cox, Tex. Com.App., 211 S.W. 932.

■ There is nothing in the record to show that C. C. Clamp ever made known to Armstrong, Sr., C. A. Goeth's demand that he relinquish his reserved mineral interest and that he executed the release and quitclaim with knowledge of this demand. Until the conversation between Clamp and Goeth is brought home in some way to Armstrong, Sr., it is in no way binding upon him and is hearsay as to him.

■ It is further contended by appellants that the circumstances are sufficient to show Clamp's authority to act for Armstrong, Sr. We overrule this contention. It is true that after the conversation between Clamp and Goeth, Armstrong, Sr., executed the release and quit-claim, dated April 18, 1903, but, as was properly held by the El Paso Court of Civil Appeals, this instrument when considered from its four corners was nothing more than a release of the deed of trust lien and vendor's lien securing the payment of the Barlow notes, Armstrong v. Humble Oil & Refining Co., supra, and the payors of the note were clearly entitled to such a release in any event. If Armstrong had executed an instrument expressly conveying to such payors his one-third reserved mineral interest, then a presumption might arise that he had knowledge of the agreement made between Clamp and Goeth. The fact that after the Barlow note was paid Armstrong was able to sell the other notes to Drought & Company would not prove that he had authorized the agreement made between Clamp and Goeth.

■ However, if the stricken testimony should be regarded as admissible, it would be insufficient and incompetent to change, add to or alter the language of the written instruments relied upon by appellants to show that Armstrong, Sr., had relinquished his retained, undivided one-third mineral interest. In that part of the release executed by Andrew Armstrong, Sr., of the $10,800.00 Barlow & Company note the language used is as follows:

"* * * have remised, released, quitclaimed, discharged and acquitted unto the said Henry Caley and Alexander J. Uhl, Jr., and to the said Goeth and Duessen, assigns of said Caley and their heirs and assigns, the vendor's lien heretofore existing upon said land by reason of said note for $10,800.00, and I hereby quitclaim unto them all the right, title and interest I have in said premises described in said deed to Henry Caley and Alexander J. Uhl, Jr., recorded in La Salle County Records, Vol. L: pages 520-25, retaining only a vendor's lien against said land to secure the payment of the remaining six notes for $4,- 125.15 each, described in said deed * * *."

This language is clear that Armstrong, Sr., is quitclaiming the premises described in his deed to Caley and Uhl, Jr. Turning to this deed we find the premises described are the surface rights and two-thirds of the mineral rights of the 18,020 acres. The excepted one-third mineral interest was no part of the real estate conveyed by that deed. It had become as separate an estate as if. it were a separate piece of land. Armstrong v. Humble Oil & Refining Co., supra; Humphrey Mexia Co. v. Gammon, 113 Tex. 247, 254 S.W. 296, 29 A.L.R. 607.

What was said by Justice Williams, in speaking for the Supreme Court of Texas, in Sanborn v. Crowdus Bros. & Co., 100 Tex. 605, 102 S.W. 719, 720, is in point here:

"But by its recitals it connects itself with the former conveyance recited, and the two are thus made the complement of each other. Whether or not, if it stood alone, it would be sufficient evidence of title to all of the land mentioned in it, we need not determine; for if the conveyance recited has been produced, the two are to be construed together, and the question as to what property has been conveyed is thus to be determined. If a deed of the date of that recited in the release were produced, and the effect of the two documents were to be determined from their language, unaffected by extrinsic evidence, it seems clear that the first instrument would control in the determination of the question as to what property had been conveyed. *This would result from the fact that the release, by its own terms, subordinates itself to the deed; its purpose being only to free the title conveyed by the latter from the incumbrance which it imposed in favor of the grantor.* Hence the conflict between the two in the description of the property affected would be resolved by the controlling effect of the deed of conveyance if only the writings be considered." (Italics ours.)

When the deed and release are construed together it is certain that the quit-claim was not intended to apply to the one-third mineral interest which had been effectively excepted out of the conveyance. There is in fact no ambiguity apparent on the face of either instrument when construed together or separately, which would render admissible parol evidence of extrinsic facts. Owen v. Associated Oil Co., Tex.Civ.App., 281 S.W. 607.

The rule is well stated as follows:

"Contracts * * * are to be read and understood according to the natural and obvious import of the language, without resorting to subtle and forced construction for the purpose of either limiting or extending their operation. Courts cannot correct suspected errors, omissions, or defects, or by construction, vary the contracts of the parties. If the words employed convey a definite meaning, and there is no contradiction or ambiguity in the different parts of the same instrument, then the apparent meaning of the instrument must be regarded as the one intended." Schoonmaker v. Hoyt, 148 N.Y. 425, 42 N.E. 1059, 1061.

Let us now consider the assignment of the six vendor's lien notes by Armstrong, Sr., to H. P. Drought & Company. It is clear from a reading of this assignment that Armstrong, Sr., was assigning to Drought & Company the six vendor's lien notes, together with the lien and superior title to the land conveyed to Caley and Uhl, Jr., by deed dated April 17, 1901, and recorded in Book L, page 520, of the Deed Records of La Salle County. Again referring to this deed we find the land conveyed was the surface estate and two-thirds of the mineral estate of the 18,020 acres described therein. This, of course, would not include the reserved one-third mineral interest which was never conveyed to Caley and Uhl, Jr.

The following language used in the assignment renders the above conclusion inescapable, to-wit:

"* * * this assignment is given to convey any interest either in the above described vendor's lien notes or the land described and conveyed in the deed from me to Henry Caley and Alexander J. Uhl, Jr., hereinbefore referred to, which may not have been conveyed by me to said H. P. Drought & Company by assignment dated July 1st, 1901, * * *." Humphrey Mexia Co. v. Gammon, supra; Armstrong v. Humble Oil & Refining Co., supra.

Appellants next claim the one-third retained mineral interest by virtue of the provisions of Art. 5519a, Vernon's Ann. Civ.Stats., which read as follows:

"Art. 5519a. Title to land by limitation

"In all suits involving the title to land not claimed by the State, if it be shown that those holding the apparent record title thereto have not exercised dominion over such land or have not paid taxes thereon, one or more years during the period of twenty-five next preceding the filing of such suit and during such period the opposing parties and those whose estate they own are shown to have openly exercised dominion over and asserted claim to same and have paid taxes thereon annually before becoming delinquent for as many as twenty-five years during such period, such facts shall constitute prima facie proof that the title thereto had passed to such persons so exercising dominion over, claiming and paying taxes thereon."

This claim must fail because the record does not show that appellants have paid the taxes thereon annually before becoming delinquent for as many as twenty-five years next preceding the filing of such suit. This is clearly a requirement of the statute. There is but one period described in the article, which is twenty-five years next preceding the filing of such suit, and the taxes must be paid annually before becoming delinquent for each of these twenty-five years.

Appellants also claim under other statutes of limitation, Arts. 5507, 5509, and 5510, Vernon's Ann.Civ.Stats., but these statutes all require open, adverse and hostile possession of the land for either three, five or ten years. Here the estate sought to be recovered is the one-third undivided mineral interest retained by Armstrong, Sr. It has been effectively severed from the surface estate and possession of the surface is not possession of this severed mineral estate. Sommers Oil and Gas, Vol. 1, page 358, § 138. The evidence here does not show any such open, adverse and notorious possession of the minerals.

Furthermore, appellants became tenants in common with appellees as to their undivided mineral interest and limita-

tion would not run in favor of a co-tenant in possession.

Appellants' other points are without merit and are overruled.

The judgment is affirmed.