## DIMMITT v. DIMMITT.

### No. 10182.

Court of Civil Appeals of Texas. Austin.

Dec. 16, 1953.

Rehearing Denied Jan. 13, 1954.

---

Fred C. Brigman, Jr., Uvalde, Morriss, Morriss, Boatwright & Lewis, San Antonio, for appellant.

Ralph W. Yarborough, E. Wayne Thode, Austin, Suttle & Kessler, Uvalde, for appellee.

HUGHES, Justice.

This is a suit for divorce brought by appellant, Dr. Dean P. Dimmitt, against his wife, Mary E. Dimmitt, and involves as well his plea for cancellation of a certain conveyance and adjudication of their property rights. The parties have one minor child, Deanna, whose custody appellant concedes to her mother.

Trial of about two weeks duration was to a jury which answered all issues submitted to it in favor of appellant.

Appellee filed a motion for judgment and for judgment notwithstanding the verdict of the jury, the principal basis for which is to be found in the following excerpts therefrom:

"That the within suit by plaintiff as against defendant, being one for divorce and embracing a dispute as to the distribution of property incident to divorce, the answers of the jury on such issues are merely advisory.

"That although the jury by their verdict have affirmed the truth of the material allegations of plaintiff's petition, the mind of this Court must be satisfied, in view of all of the evidence herein, that such evidence is full and satisfactory, not only as to the sufficiency of the causes alleged by plaintiff, but of the truth and sufficiency of the evidence by which they were established, independently of the verdict on such Special Issues, and unless it be so, then it is the duty of the Court to set aside the verdict and refuse a decree of divorce herein.

"That it is the duty of the Court, not the jury, to fix the rights of the parties to a divorce suit in respect to property, and findings with respect to such marital property are likewise purely advisory.

"That considering all the evidence in this case, the overwhelming evidence shows that plaintiff has not proved he is entitled to a divorce by 'full and satisfactory evidence.'

"That the overwhelming evidence herein conclusively shows that the plaintiff is not entitled to a divorce, viewed from the mind of the Court, as a matter of law, and consequently, that the plaintiff's petition for divorce should be denied. That said petition for divorce being denied, as a matter of law, then this Court is without jurisdiction to pass upon or adjudicate the property rights placed in issue by plaintiff's application for divorce against defendant."

This motion was sustained by the court in this language:

" * * * and it further appearing to the Court, and the Court so finds, that the law is with the defendant, and said motion to render judgment not withstanding the findings of the jury, and in disregard thereto, should be granted by the Court as hereinafter stated, and that the plaintiff is not entitled to recover herein."

Judgment was thereupon rendered denying appellant a divorce and denying all other relief sought by either party.

It is our opinion that the court below erred in denying appellant a divorce. Stated differently it is our opinion that appellant established by full and satisfactory evidence that appellee was guilty of cruel treatment within the meaning of Subd. (1), Art. 4629, Vernon's Ann.Civ.St. This was the only ground upon which divorce was sought.

Specific allegations of cruelty included (a) appellee's extreme jealousy, (b) false charges of illicit relations with women, particularly appellant's patients, (c) interference with appellant's medical practice, (d) constant nagging and quarreling, (e) having appellant arrested and placed under a peace bond without cause, (f) converting community funds.

■ Art. 4632, V.A.C.S., provides that, in a divorce suit, either party may demand a jury but that the decree of divorce shall be rendered upon full and satisfactory evidence, upon the judgment of the court affirming the material facts alleged in the petition. Art. 4633, V.A.C.S., provides that, in divorce suits, " * * * the court or jury trying the case shall determine the credibility of such witness (husband or wife) and the weight to be given such (his or her) testimony. * * *." This rule is also applicable to witnesses other than the husband or wife. Mortensen v. Mortensen, Tex.Civ. App., San Antonio, 186 S.W.2d 297.

The jury having found that appellee was guilty of cruel treatment it was then for the trial judge to determine, in the first instance, whether or not such finding was supported by full and satisfactory evidence and it is now the duty of this Court to determine the same question. This we will do upon a consideration of the entire record insofar as it relates to the "material facts alleged in the petition."

The parties were married in 1934 and lived together as husband and wife until May, 1951.

Appellant was born in Missouri in 1909, moving to Texas four years later where he has since resided most of the time. He left public school before reaching high school. The following seven years he worked in oil fields and other places losing employment in the depression of 1930's. He then attended Hannibal College in Missouri for two years, the University of Texas in Austin two years and in 1940 was graduated from the Texas Medical School at Galveston. Following a year's internship at San Antonio Dr. Dimmitt was in private practice a short time before being called into military service on July 7, 1941, where he remained until March, 1946. He served overseas in the Southwest Pacific area from February, 1942, to October, 1944, when he returned to this country. Since early 1946 Dr. Dimmitt has practiced medicine in Uvalde, Texas.

Shortly after Dr. Dimmitt returned from overseas and before his discharge from the army he and his wife quarreled while staying at a tourist court in San Antonio which lasted all night and part of the next day. The occasion for this quarrel was that appellee had read a magazine article about an American officer who had run around with Australian women and she accused the doctor of being the officer in question and of having had affairs with women while he was in Australia. Dr. Dimmitt had told his wife about two women he met overseas, testifying:

" * * * one of whom was a nurse that I met when I first arrived overseas, who was a friend of an Australian doctor. This doctor took me and another American medical officer on a scenic trip out from Melbourne, and he took this nurse along. Later, during my stay in Melbourne, this lady and her family, invited me one time to accompany them to a musicale concert in Melbourne.

\* \* \* \* \* \*

"I told her all about those things because it was my belief that I should not withhold anything from her, even to accepting this invitation to this musicale concert in Melbourne. I didn't accompany this young lady alone. Her sister and mother were along."

Not long after the parties moved to Uvalde the following occurrence was testified to by appellant:

"* * * after we moved here and I had an office across the square here, I was over there one night working in the office, and we were staying here at the Kincaid Hotel, and while I was working over there I received a call to go see a patient. I went to see the patient and when I got back I found the police had broken into my office, under her (appellee) direction, she thought I was there, and after I got back then and talked to her, she quizzed me about where I had been and who I had been with, intimating that I had been off with some woman, and she had broken into the office to see who I was with, and found no one there, although I had gone off on a call, I did leave the lights on and was coming back there and finish my work there.

* * * * * *

"She questioned me about who I had been with, who I went to see; asked me if I had been off with some woman."

Another incident related by the doctor was:

"* * * we went to Corpus Christi with the Norman Foleys on a fishing trip. We stayed at Mrs. Foley's parents' home in Corpus Christi, and the next morning drove over to Port Aransas and went fishing. There was Mr. and Mrs. Foley, Mrs. Dimmitt and our daughter, Deanna, and myself out fishing. The man whom we rented the boat from and who was operating the boat, let the boat get cross ways of the waves, and a big wave came up and tipped the boat way up on its side. Mrs. Foley was to my left, and Mrs. Dimmitt to my right and Deanna was to the right of Mrs. Dimmitt. We were all facing the back end of the boat and Mr. Foley was on the extreme right of the boat when you are looking out across the back of it. The boat tipped toward the left hand side of the part where you are facing the back of it, and threw Mrs. Foley almost entirely out of the boat, and I glanced and saw nobody else was falling and I reached out like that (indicating) and grabbed Mrs. Foley and pulled her back into the boat. We were all drenched as the wave went over the boat. Nothing was said about that for several days; then one evening when I came home she seemed to be particularly upset about something and got after me for having kept Mrs. Foley from falling in the water, and asked me what particular interest I had in Mrs. Foley, and I told her I had none except she was falling in the water; and that has come up several different times since then and she accuses me of having some interest in Mrs. Foley, and wanted to know why I was not more concerned about her than I was from keeping Mrs. Foley from falling in the water. She accused me of paying more attention—of paying no attention to her and devoting all my attention to Mrs. Foley.

"Q. Did she bring it up over and over? A. Yes, she did.

"Q. And was that brought up in a nagging, unpleasant way or not, Doctor? A. Yes, sir."

Dr. Dimmitt had a Miss Kitty Farr employed as a practical nurse who had requested him to let her assist in the delivery of a baby and, according to the doctor:

"A short time later I had two women whom I had agreed to deliver their babies for call me the same evening; both of them were in labor.

* * * * * *

"I called her (Miss Farr) and asked her if she was available to help me with those, that I would like for her to go by and watch one that I thought would be the slowest, while I went over to the other whom I thought would deliver first. She said she would, so I went by her home where she was stay-

ing with her grandmother and got her and she was in her uniform, and I took her to the home of the patient who was to have her first baby and the one I thought would be the slowest, and instructed her how to watch her and what to do for her, and told her where to locate me if she thought she needed me before I got back, and I left and went to attend the other lady. Both were Mexican patients. The one that I was with quit having labor pains; just quit having labor pains entirely, so I went back to where I had left her with the other patient and she had quit having labor pains, so it was about eleven o'clock and I started to take her home; as I got down here— entered from that little alley that comes up from West Main across to Nopal there by the Dairy Kream and cuts across to Nopal, just as I came through there I met Mrs. Dimmitt in a pick-up with Mr. Glenn Feeley, who was then a business partner of mine, headed east. I didn't stop; I went on around to take the young lady home. I dropped her off at home, then I went by to see another patient that I had told I would come by and see that night, and then I returned to my home. When I got home I was accused by Mrs. Dimmitt of having an affair with Miss Farr.

\* \* \* \* \* \*

"She asked me what I was doing with her, and I told her I had taken her out on this case with me and was on the way home with her. She asked me about who they were; I told her where they lived; on what streets the patients were, but that they both had quit having labor and I did not deliver them that night. I did delivery—I did deliver both of them subsequently, quite a while later, and she accused me and said she didn't think that was so at all; that I was just out with her and had an affair with her, which, of course, is not true at all.

\* \* \* \* \* \*

"\* \* \* she demanded then; and for a good many days thereafter, un-til I got rid of Miss Farr, that I discharge her as an employee."

Shortly after this incident Dr. Dimmitt testified that he received a telephone call from Mrs. Boding who told him that her mother who lived near Utopia was ill and that she was worried about her and, in the words of appellant:

"It was very late in the evening, almost dark. I had finished up my calls I had to make in town, the last one being just off the San Antonio highway near this Drive-In in the back of the drive-way. So I stopped into that drive-way and called Mrs. Dimmitt over the phone and told her I had to go out of town up the other side of Sabinal, and she told me she wanted to go with me. I told her I was clear across town and on my way then and I said, its late now, so I went on. Also, Mrs. Boding had told me she was there in Sabinal and had started up to see her mother, and her car was not running good and she wanted me to stop there at Sabinal and take her with me, and I stopped there and picked her up close to that Motor Inn and started toward Sabinal. After I had talked to Mrs. Boding a little more about her mother and her mother's symptoms, I told Mrs. Boding there was no need for me to go to Utopia to see her mother, that her mother was not that ill, and that I would give her a prescription for the medicine I thought was necessary and I could see no reason to go up there.

\* \* \* \* \* \*

"I brought Mrs. Boding back to her car and left her there and returned to Uvalde.

\* \* \* \* \* \*

"When I got back Mrs. Dimmitt told me that she had followed me to Sabinal and had seen a woman in the car with me. I told her the circumstances of the call, who it was, and that I returned her back to her car and came on home and that's all there was to it.

* * * * * *

"She then accused me of having an affair with Mrs. Boding day in and day out. There was not a day for weeks that that was not a source of constant nagging and getting after me about it."

Mrs. Boding testified and denied any improper conduct by her or appellant.

With reference to appellee's criticism of the doctor's family he testified:

"So far as I know, Mrs. Dimmitt never knew my father, but I can't count the number of times that Mrs. Dimmitt has been very very critical and said some very, very unkind and untrue things about my father; that he was just plain no good; that he was not good to his family; that he didn't provide well for his family, and that I was just like him, and yet she never knew him; but she claimed she met some people down in the Rio Grande Valley when she taught down there that claimed he was that sort of man. I fully realize my father was not a perfect man, but I had all the respect in the world for him. My father died of cancer of the colon when I was overseas and was buried before my return, and I requested her repeatedly, out of respect to him, the fact that he was dead and gone, that she please refrain from any kind of remarks about him that were not such that I could accept, but she would repeatedly bring this up every time we have a quarrel, well, you are just like your father; he was no good and so are you. She was very critical of my sisters, especially my sister at La Pryor. She told me on many, many occasions that even my sisters could not get along with me, and yet we have been the best of friends always. She told me that my sisters said I was no good, but—and I think my sisters will testify to that."

In October 1951, after the parties had separated, the doctor in preparing for a hunting trip to Colorado telephoned his wife that he wanted certain equipment out of a storeroom behind the garage and, according to appellant:

"I called her in the afternoon about coming out and getting these things, and she told me she would not let me have them. I called her later on that evening and she still refused to let me go and get them; then I called her back late that evening and she said, well I am having my bridge club, or some club, over and will you wait until they leave?

* * * * * *

She was having some club of friends over for dinner, a bridge party, I believe, and she asked if I would wait until after they were gone, and then I could come, and I asked when they would leave, and she said they would be gone approximately at ten o'clock, and I said I would wait until after that to come, and when I did come for the things a part of those things, and a lot of things I didn't want at all—some things that didn't even belong to me—was piled out in front of the driveway. I knocked on the door and told her all the things I needed for the trip were not there, and I said, may I go into the garage and get them; she said, thats all the things you asked for on the telephone and thats all you are going to get. I told her I needed those other things and was leaving early in the morning, and I asked her to give me the key to the store room so I could get them, and she refused to do so.

* * * * * *

"The garage and the store room is locked with a pad lock and she had the key to both; so I told her if she would not let me in I would go in any way, and she said I would have to because she was not going to let me, so I got a tire tool and stuck it in the hasp of the lock—

"* * * it was a U shaped hasp and I stuck the tire tool in that U shaped bar and twisted it off and went in and got the equipment I needed.

\* \* \* \* \* \*

"While I was doing that a city policeman and the sheriff and the county attorney came out and asked me why I broke in, and I told them that I was just obtaining this hunting equipment that I wanted to take to Colorado. So then I put all those things in my car and brought them down to the Clinic and sorted them out and put them in my car ready to leave the next morning.

\* \* \* \* \* \*

"When I got back from this trip, very shortly after I got back from this trip to Colorado, the sheriff came over and told me I was being placed under a peace bond; \* \* \*."

There is a great deal of evidence concerning appellee's handling of the family finances and of her interference with the management and operation of appellant's office. The following excerpts from the testimony of appellant disclose the nature of this evidence:

"She (appellee) insisted upon doing all the depositing of the money, and insisted that I turn over the money to her to deposit and let her keep account of it.

\* \* \* \* \* \*

"Every night when I came in I would leave the day's receipts on the dresser, and leave them there when I left the next morning.

\* \* \* \* \* \*

"Even farther than that; on a good many occasions she has gone through my bill fold and taken all the money out of it except forty or fifty dollars I would need for change."

Explaining why he countenanced this appellant stated:

"It was just trouble if I didn't, and it was further trouble when I ceased to do so."

Appellant took over control of his earnings when he learned, by chance, that appellee had converted cash into about $18,000 in government bonds standing in the name of appellee or appellee and Deanna and only $500 of which stood in his name. "\* \* \* When I (appellant) asked her about changing the bonds over to our names jointly, she said she didn't think that was necessary and would not do it."

"Upon another occasion, when I built the Clinic, the cost of building the Clinic ran into more money than we originally figured on, and I was running low on money to pay the help and material, and I came home one evening and talked to her about the possibility that we might have to cash some of the government bonds she told me she had bought with money I had given her—

\* \* \* \* \* \*

"And we talked about that for two or three days, and finally when I realized I was going to have to dig up some money to finish paying the building, she dug up $7,000.00 in cash that I knew nothing whatever about, that she laid away out of money I had given her from daily receipts, and I had no knowledge before that day we even had this $7,000.00, but she dug it up rather than cash any government bonds that had been purchased."

Appellant also testified that $11,000 on deposit in the Frost National Bank of San Antonio was in the name of appellee only when it should have been in their joint account. Appellant also testified when asked about a $5,000 deposit in the Alamo National Bank at San Antonio in appellee's name that he had never before heard of such a deposit.

As to appellee's interference with office matters appellant testified:

"\* \* \* Mrs. Dimmitt told me that she obtained a list of the names of patients that owed me accounts, and she kept constant track of who owed, and how much was owed me, and how much was on the books. That was a constant source of irritation.

\* \* \* \* \* \*

"She would go down to the office and go through the books with—with the bookkeeper on who owed, the whole file, and what patients I had seen, and how old were they, and how long did I stay in the office with them. On one occasion when I came home she told me she had been to Batesville and La Pryor with this list she had gotten from the bookkeeper of people who owed me bills, and had gone down there trying to collect on those bills. That was the first I knew of it was when she told me she had already been down there.

"\* \* \* we repeatedly on many, many occasions have had bitter arguments, bitter quarrels about people that owed me, and I always contended and told her we should not worry about those things what was on the books, as long as the daily and monthly, weekly and yearly income came up to a reasonable figure, we should not let those things worry us particularly, and that we would lose more business by handling those people the way she was and making them mad, than to turn them loose and let them go.

\* \* \* \* \* \*

"She would tell me upon those occasions I was a poor business man; that I might be a good doctor, but that I didn't know a thing in the world about business, and she was the only one in the family that had any business sense at all.

"\* \* \* on many many occasions she would call the nurses or nurse receptionist. At first I just had one girl in the office, and she would call her and want to know who I had seen that day; who they were and what was wrong with them; whether they paid their bill or not, and all about them."

On one occasion appellant testified:

"Mrs. Dimmitt called me several times during the morning about accounts that were due; unpaid accounts,

and told me that I was no part of a business man, or I would not let those accounts stack up like that, and I tried to explain to her that I thought it was unwise to try to force people too strongly to pay.

"\* \* \* and she said if I was not going to do anything about it that she would; that she was coming down and get those accounts and collect them herself, and I begged of her not to interfere with the business; to let me handle that; I told her please to stay away and let me handle that, and she said never-the-less she was going to come anyhow, and so I said, this time I am going to refuse to let you interfere; so I was seeing a man and his wife in the west office in the clinic, and Mrs. Dimmitt came in the back way, and walked right in to where I was having this consultation with the man and his wife, and she stepped inside the door and said, put me out if you think you can, I own as much of this as you do, you can call the police if you want to. So I excused myself with the patients and took her by the arm and led her into the hall and tried to reason with her and leave the business alone and let me handle it, and I finally got her to leave.

\* \* \* \* \* \*

"There were patients in the reception room and those there, and, incidentally, those patients have never been back."

Appellant further related:

"She was continually at me about running around with other women; constantly inquiring as to who I saw at the office; who they were; what was wrong with them; how much time I spent with them in the office; constantly after me about my business methods and critical of my business methods. Way back when I was interning, she criticized me and tried to encourage me to obtain money from charity patients where I was interning

that was a practice of some of the internees there to interview the people there and let them know they would get better care if they got a tip on the side, which I refused, which Mrs. Dimmitt repeatedly tried to get me to do."

Mrs. Hulda Hawkes, a trained practical nurse, who had been employed by appellant from September 1946 to June 1950, and for whom both parties evidenced the highest regard testified:

"There was always quite a lot of interference on the part of Mrs. Dimmitt. She would call me early in the morning before the Doctor arrived at the office, asking about patients he had seen and about the accounts; and a lot of times after I had gone home she would call me asking about house calls and what patients he had in the hospital; she called me quite frequently.

"* * * she called and asked us to let the Doctor see her friends and not have them have to wait to see him."

She also said that it was a common practice of appellee to inquire about woman patients.

When asked about appellant's conduct in his office and treatment of patients Mrs. Hawkes testified:

"* * * I have never worked for any one who conducted himself in any more gentlemanly manner than Dr. Dimmitt, and I have worked for quite a few doctors. As far as the patients were concerned, he was always a gentleman, and never examined a patient without me being in there. I have never seen anything to go on that should not have."

Mrs. Hawkes left the doctor's employ testifying in this regard:

"* * * Mrs. Dimmitt came to me and told me that she had found the doctor with a certain party in Sabinal, and she was quite upset and told what all she was going to do; that she was going—well, she was going to break him, and she didn't make any threats as far as physical, I don't think, but she was quite upset and kept calling me and coming to see me about it and calling me, and I felt I was about to get into something that was going to be unpleasant, and therefore I resigned."

Later the parties persuaded her to return and she remained until June 1950. She now works with him in surgery at the hospital but is not employed in his private office.

There are numerous other instances of quarrels and disagreements between the parties disclosed by the record but those above are deemed sufficient for our purpose.

Effect of this marital strife was described by appellant:

"* * * On many, many occasions I have come home to lunch and she would nag and quarrel and fuss at me the whole time I was there. I have gotten up from many and many and many meals before I had eaten two or three bites before I had hardly started my meal, and left without eating.

"* * * many occasions when I would have major difficult surgery to do in the morning, she would start nagging at me, saying that I gave my patients too much time, or was not strict enough about collections, or was not strict enough on my office help. Many times when I would have these operations scheduled, especially when I first came and was anxious about my work, and still am, but I was more anxious then because I was new, she was just constantly nagging at me, and I would start out through the kitchen door through the driveway and she would yell at me clear to the street, until when I went to operate I would be nervous and shaking, and it worried me because I was constantly in fear of making a mistake. I became more

nervous all the time and lost weight constantly right along.

\* \* \* \* \* \*

"It made me extremely nervous until I developed a tremor and lost weight, and I got absent minded working in the office, we would be working along and some interruption would come along; she would call me during office hours and blast me out, and I would forget what I was doing and where we were, and I would have to ask my nurse; well, where were we?

\* \* \* \* \* \*

"I couldn't eat. I would sit down to eat and develop a nervous indigestion; I felt like I had a knot in my stomach.

\* \* \* \* \* \*

"It got to where it was continuous. All the time I was home it was about the books or patients or about the time I would spend with patients.

" \* \* \* that was not just when we were alone. She would be critical of me before company we would have."

Mrs. Dimmitt testified by deposition and in person. We quote from her deposition testimony relating to some of the principal matters about which the doctor testified, supra:

" \* \* \* Did you carry a separate bank account during all of your married life? A. As well as I recollect, we kept joint accounts.

\* \* \* \* \* \*

"Q. Did you and Dr. Dimmitt get along well in your married life? A. There are always differences.

"Q. Always differences? A. Usually, there are differences between man and wife on occasions.

"Q. Did you have those kind of differences? A. We didn't agree on every little detail.

"Q. Did you have fusses? A. We disagreed occasionally, yes.

"Q. Did you have fusses? A. What would you term fusses?

"Q. Mrs. Dimmitt, you know what a fuss is. Do you want to answer the question. All right, if you don't, it is all right. Did you ever argue with Dr. Dimmitt? A. I might disagree with him, on some issue.

"Q. Well, did you argue with him? Did you ever argue with him in your life? A. Well, yes, over maybe a presidential election or something.

"Q. Is that all you ever argued with him about, a presidential election. A. That I recall at the moment.

\* \* \* \* \* \*

"Q. Let me ask you, did you ever call Dr. Dimmitt's office and talk to a nurse or a girl there, a receptionist and ask about particular patients who were there, or who had been there? A. I don't know that I asked about certain names.

"Q. What did you ask? A. I might ask how many more patients he had to see.

"Q. You didn't inquire about his patients, and who they were? A. I don't recall asking about certain names.

"Q. Did you call the Doctor's Clinic, and ask the girl there if certain women were in the office? Would you say you didn't, or do you recall? A. I don't remember asking about any names.

"Q. What you say, is it might have happened, but you don't recall? A. I don't recall.

"Q. Did you ever, when the doctor came home at night, insist on knowing who he had attended that day, and who had been in the place? A. In a general conversation I might ask him how many patients he had seen that day.

"Q. Did you check up with him on the books about how much money he was making or collecting? A. Upon request from him, I might occasionally.

"Q. Without request from him, did you ever do that? A. Upon request from him, I would check with him.

"Q. Did you ever ask him one thing about it, any time? A. I don't recall particular times or instances.

"Q. Did you ever ask him, you can recall whether you did or not? A. I don't recall any particular time.

*　　*　　*　　*　　*　　*

"Q. Don't you know on a number of occasions you had argued with Dr. Dimmitt so violently he got up from the table and left when you were eating? A. I don't recall.

*　　*　　*　　*　　*　　*

"Q. Mrs. Dimmitt, I ask you this, have you ever accused Dr. Dimmitt of being unfaithful to you? A. Any specific time or date?

"Q. I ask you the question, did you ever accuse him of being unfaithful to you? Can you answer the question Mrs. Dimmitt, whether you have ever accused him of being unfaithful to you? A. I would have to think a minute before I could give an answer.

"Q. Have you thought a minute now? A. No, sir I haven't.

"Q. How many more minutes do you want to think; I am not trying to hurry you? Are you trying to think up an answer, or trying to think whether you did nor not? Did you ever accuse the man of being unfaithful; you or any one can answer that in half a second? A. I can't answer the question without you giving me time to think.

"Q. Do you want to answer that question or not? A. I haven't had a chance to answer.

"Q. I give you another chance; do You want to answer or not? A. If you will give me time.

"Q. How much time do you want, it is 3:20 now? How much time do you want? You can answer the question yes or no. A. I don't recall making that accusation.

"* * * I will ask you if you if you ever accused him of being with any woman in Sabinal? Any in all Uvalde County, I put it that way, including the whole county? A. I don't recall.

*　　*　　*　　*　　*　　*

Q. "Did you ever criticize Dr. Dimmitt's father to him? A. I didn't know Dr. Dimmitt's father personally.

"Q. I asked you if you ever criticized Dr. Dimmitt's father to him? A. I don't recall any particular criticism.

*　　*　　*　　*　　*　　*

"Q. Did you tell Dr. Dimmitt that his father was a no good, and he was just like him. A. I don't recall making that statement.

*　　*　　*　　*　　*　　*

"Q. I ask you again specifically, Mrs. Dimmitt, whether or not you have ever accused Dr. Dimmitt of being unfaithful to you. A. At the moment I don't recollect of accusing him."

Most of the other deposition testimony of appellee was of similar vein. When Mrs. Dimmitt appeared on the witness stand she was a more responsive witness. This difference in attitude was explained by saying that in the deposition she was a "reluctant" witness and that she then had hopes of a reconciliation. Her version of the Mrs. Boding incident follows:

"He called me around eight o'clock that he was going to Sabinal on an emergency call; we were going out to dinner, and Deanna and I were dressed, and I asked him if we could go with him, and he said it was an

emergency call, and that he could not come back and pick us up. I asked him where he was and he said he was on the San Antonio highway, and then I said it would not take but a few minutes to pick us up, that we would like to go with him, and he said no, since it was an emergency he had to go right on and would be back in a little bit. Deanna was standing by the phone and I told her what he said, and she said, let's go to Sabinal and eat with daddy in Sabinal; so we left immediately and went to Sabinal. As we crossed the bridge just this side of Sabinal I noticed the speedometer was on the dot; I mean by that, we were out of gas, so we drove into the first station we could get into, and it's on the left hand side of the road on the corner, and we stopped at this filling station for gas, and Dean passed right after we stopped; Dean and some woman that neither of us knew, and he turned down that street which goes right down the center of Sabinal; I knew he had two patients out that road, the O'Briens and the Kincaids, and we turned and let him know we were in town to see if he were going to stop at the O'Briens or Kincaids, and when he got on the other side of Sabinal, just beyond a park—there is a parking lot, one road goes to Utopia and one road goes to Leakey, they didn't take the one that goes toward the O'Briens, but they took the one that goes to Mr. Kincaid's. Just as they got beyond the forks of the road they embraced and Deanna started crying and said, that woman is putting her arm around my daddy, and I honked the horn to let him know I was there, and he moved the arm and pushed her head down like this (indicating) and drove off fast, and I turned around and came back to Sabinal and got gas and then I came home."

Appellee also testified that the doctor admitted an illicit relationship with Mrs. Boding on this and on previous occasions.

Appellee explained having a policeman break into her husband's office at night by saying that she was worried about him.

As to the Kitty Farr incident appellant's version is weakened by the absence of his and official records to show births corresponding to his testimony and appellee fixed the time of seeing him and Miss Farr at 2:30 A.M., and she testified that the doctor later admitted Miss Farr's "activities."

Mrs. Dimmitt testified that all of her participation in the business affairs of her husband was done with his knowledge and consent.

She also testified that she did not remember questioning her husband about a magazine article referring to an army officer and his amorous affairs overseas; that she had never aggravated or questioned appellant about other women or accused him of affairs with them, she said that he "told me about the women."

Mrs. Dimmitt expressed her opposition to divorce on principle and did not desire a divorce.

█ We repeat our conclusion that the verdict of the jury finding cruel treatment is supported by evidence which is full and satisfactory.

Appellee pleaded as a defense and as a bar to the granting of divorce to appellant that he was guilty of adultery.

There is a great deal of evidence in the record relating to appellant's association with other women after his permanent separation from his wife. We have not set this evidence out for the reason that the jury found appellant not guilty of adultery and appellee does not question the sufficiency of the evidence to sustain this finding. Appellee does contend, however, that the evidence must be full and satisfactory "that appellant did *not* commit adultery before a decree of divorce could be rendered for appellant in this cause."

■ This is a strange position for appellee to take in view of the fact that she did not object to the form of the issue submitted to the jury on adultery which required the fact of adultery to be found from a preponderance of the evidence. Since appellee pleaded this defense the burden was necessarily cast on her by the court's charge. If there was error in this charge it has been waived by appellee's failure to object. Rule 274, Texas Rules of Civil Procedure.

Appellee cites in support of the position taken here the cases of Franzetti v. Franzetti, Tex.Civ.App.Austin, 120 S.W.2d 123; Jones v. Jones, Tex.Civ.App.Galveston, 176 S.W.2d 784, and Lindsey v. Lindsey, Tex.Civ.App.Amarillo, 228 S.W.2d 878. We have read these cases and in our opinion they do not support the rule for which appellee contends. In fact in Franzetti this Court approved an issue in substantially the same form as submitted in this case.

■ We find nothing in Art. 4632, supra, which requires that defenses relied upon to defeat a divorce should be established by full and satisfactory evidence, certainly nothing therein which requires a plaintiff to negative such defenses by such quantum of proof.

As mentioned above appellant also sued for cancellation of a deed to certain properties which he had executed in favor of his wife. Issues respecting this feature of the case were submitted to the jury and answered favorably to appellant.

The substance of these findings is that appellee agreed to reconvey to appellant the properties conveyed by the deed in question when "the danger of a then allegedly threatened lawsuit had ceased or blown over," that appellant relied upon such promise and that appellee did not at the time she made such promise intend to keep it.

Appellee has three counterpoints pertaining to these matters, the first two of which are to the effect that since the divorce was denied the court was thereby deprived of its authority to adjudicate property rights as between the parties. In view of our holding that the trial court erred in denying a divorce to appellant it is unnecessary for us to further consider those two counterpoints.

The third counterpoint urges that appellant was not entitled to cancellation of the deed in question because of "the doctrine of clean hands."

■ Appellee's contention is that the conveyance was made with the intent to delay, hinder and defraud creditors and that under such circumstances the courts will not enforce an agreement to reconvey citing Bramlett v. Jenkins, Tex.Civ.App. Fort Worth, 231 S.W.2d 539, writ ref. n.r.e.

Since this fraudulent scheme was not pleaded and no issue thereon was submitted to the jury and none requested and since it is not contended that such fraudulent purpose is established by the undisputed evidence it is our opinion that the question presented by appellee is not before us. Rules 94 and 279, T.R.C.P.

Appellee's first crosspoint is that this cause should be reversed and remanded because of the failure of the trial court to declare a mistrial because appellant's counsel asked a witness for appellee the following question:

"Q. Was it before or after this incident you were down at the Honey Hut with your present wife and found her stripped, and you were ordered to leave; was it before or after this incident?"

The question was not objected to and the witness denied the assumptions in the question. Thereafter appellee made a motion to strike the question which the court sustained and instructed the jury not to consider it.

■ The motion for mistrial was not made until after the jury had returned its verdict. Under these circumstances appellee has waived any right of mistrial which

she may otherwise have had. Ford v. Carpenter, 147 Tex. 447, 216 S.W.2d 558. The case of Springer v. Strahan, Tex.Civ. App.Waco, 180 S.W.2d 654, cited by appellee, is a case in which a motion for mistrial was made immediately after the offensive question had been asked.

 Appellee's second crosspoint is that the court erred in refusing to allow her to introduce in evidence a carbon copy of a letter written by the wife of a witness to such witness the day following an incident of a material nature. Appellee offered to account for the absence of the original letter and also to prove that the copy was correct. The letter was excluded on the objection that it was hearsay evidence which it clearly is. Appellee does not contend otherwise but says the letter was admissible because res gestae. In order to come within the rule of res gestae, among other requisites, the declaration must be spontaneous and must be such as to exclude the idea of premediation. 17 Tex. Jur. p. 620. The writing of a letter on the day following the incident being investigated and which the letter is alleged to relate without any evidence pertaining to the conditions or circumstances under which the letter was written is, standing alone, insufficient to exclude the idea of premediation on the part of the author of the letter and, in our opinion, the letter was properly excluded.

Appellee's last crosspoint is that the court erred in excluding letters written by or about the father of appellant.

One letter was from the Mortuary Recorder of Los Angeles to Mrs. Jay Callahan, a sister of appellant; one was to Mr. Dimmitt from the Los Angeles Chief of Police; the other two were from Mr. Dimmitt to appellant.

The first letter showed that Mr. Dimmitt died February 21, 1943, the cause of death, and that Mr. Dimmitt gave his brother—not his children—as a relative.

The second letter was in answer to an inquiry which Mr. Dimmitt had made concerning the whereabouts of appellant.

The third letter complained of ill health and asked appellant for money and ended "Won't you at least write me? Tell me to go to hell or lend me the few $'s."

 The fourth letter was also asking appellant for money in which Mr. Dimmitt said:

"I must say I am sincerely sorry you feel as you do. Whatever I have done to you or for you has had but one purpose, to try to help you. It's true I have used money you earned. You too have used money I earned.

"We disagreed about something in K. C. I do not remember what. But isn't that only natural?

\* \* \* \* \* \*

"Won't you forego your aversion; forget and lend me the $75.00?

\* \* \* \* \* \*

"My health is such I cannot work as I once did. So for once relent this determination. Help me beat a bread-line."

We find nothing in these letters which reflect upon the character of Mr. Dimmitt nor which would justify appellee in berating Mr. Dimmitt's memory. The gravamen of the cruelty charge in this respect is, as we understand it, that appellee made frequent unsavory references to appellant's father and preached "like father like son." The cruelty would be just as severe, probably more so, if the father actually had been of ill repute which this record and these letters do not show. We do not believe that there was error in excluding these letters or if so that it was of sufficient gravity to require a new trial.

In accordance with the several conclusions reached by us and stated herein we reverse the judgment of the trial court with instructions to grant appellant a di-

vorce from appellee, cancel the deed of May 12, 1949, described in the evidence, award appellee custody of the minor child of the parties, Deanna, and to dispose of the community property and property rights of the parties in accordance with applicable principles and rules of law and to determine such other matters as may be necessary to completely and finally dispose of all issues in this suit, final judgment to be rendered and entered only after reasonable notice to or waiver of notice by the parties or their attorneys of record and such hearing as the court may desire.

Reversed and remanded with instructions.