## CHARM TRED MILLS, Inc. v. ERLE P. HALLIBURTON, Inc.

### No. 10668.

United States Court of Appeals
Seventh Circuit.

Feb. 9, 1953.

Rehearing Denied March 19, 1953.

David F. Taber, James P. Dillie and Richard L. Merrick, Chicago, Ill., Isham, Lincoln & Beale and Charles D. Albright, Chicago, Ill., of counsel, for appellant.

Mayer Goldberg and Leonard L. Levin, Chicago, Ill., Joseph Minsky, Chicago, Ill., of counsel, for appellee.

Before DUFFY, FINNEGAN and SWAIM, Circuit Judges.

DUFFY, Circuit Judge.

Appellant seeks to reverse a district court judgment assessing $61,197.74 in damages for an alleged breach of an oral contract to purchase 275,000 yards of finished cotton goods sometimes referred to as single filled duck material. The issues were tried to the court without a jury.

Defendant, a Delaware corporation, with principal place of business in California, was a manufacturer of aluminum furniture and other items. Van Buren Fabrics, Inc. (hereinafter called Van Buren) was a jobber of cotton materials. T. A. Shaw and Company (hereinafter called Shaw) was the authorized selling agent of Van Buren. On December 6, 1946, plaintiff merged with Van Buren and prosecutes this claim which it contends had theretofore accrued to Van Buren.

Commencing in April, 1946, defendant negotiated with Shaw in an attempt to obtain a quantity of duck material 40½" in width and weighing 14.50 ounces per yard. The court found that on August 13, 1946,

defendant entered into an oral contract with Van Buren through Shaw whereby defendant agreed to purchase from Van Buren approximately 47,000 yards of duck material 40½″ wide and weighing 14.50 ounces per yard; further that the parties agreed that said duck material would be finished and dyed in blue, yellow, green and red colors, and that the price of said material would be the selling price of finished goods as fixed by the regulations of the Office of Price Administration (hereinafter called OPA) and that Shaw would advise defendant of the prices when figures for computation thereof were made available by the OPA.

After August 13, 1946, defendant and Shaw communicated further by correspondence and by telephone. The court found that on September 21, 1946, defendant orally agreed with Van Buren, acting through Shaw, that the quantity of said duck material was to be increased to a total of 300,000 yards, with delivery in four equal amounts on the first day of each month commencing November 1, 1946. The parties also agreed as to the number of yards of duck material to be delivered in each of certain specified colors. On September 21, defendant sent Shaw a written memorandum reaffirming the telephone conversation of that day.

The parties continued to communicate, both orally and in writing, and on October 1, 1946, defendant sent to Shaw a letter referring to defendant's previous memorandum of September 21. This letter confirmed the previous agreement between the parties but fixed the quantity of duck material at 275,000 yards.

The goods which defendant agreed to purchase were to be manufactured in grey condition, by Monticello Cotton Mills of Monticello, Arkansas (hereinafter called Monticello), and then were to be shipped to Lanett Bleachery and Dye Works at Lanett, Alabama, for dyeing and finishing. The first shipment of such material was made from the mill to the finisher on August 15, 1946, and by October 11, 1946, a total of 165,630 yards of the duck material had been manufactured by Monticello and sent to the finishers.

On September 30, 1946, defendant sent to Van Buren a written memorandum or purchase order, No. 3100. This memorandum ordered from Van Buren a total of 275,000 yards of duck material of specifications hereinbefore described. It also specified the number of yards to be finished in each of eight different colors. The memorandum confirmed the request that one-fourth of each color quantity be delivered on or before November 1, 1946, with deliveries of the balance in three equal quantities on the first day of each of the following three months. In the space provided for designation of the unit price of the material, the memorandum contained the word, "Advise," and also stated, "Advise us as to exact shipping dates in advance, quantities to be shipped, prices, finished widths, colors, and methods of shipment as outlined in our letter of Sept. 21, 1946."

On October 7, 1946, defendant sent a memorandum to Van Buren, "Hold production on all quantities until further notice. This is not a cancellation." On October 8, 1946, prior to the receipt of defendant's October 7 memorandum, plaintiff sent defendant a letter setting out the maximum ceiling prices per unit of the goods, varying with the different colors, and with the month of delivery by the mill to the finisher.

On October 10, 1946, defendant sent Van Buren a telegram which requested Van Buren to cancel all unshipped balances of said purchase order, No. 3100, and making the request, "Submit formal cancellation charges at earliest possible date." On October 11, 1946, defendant sent to Van Buren a memorandum confirming its telegram of October 10 cancelling said purchase order, No. 3100. This memorandum also requested that formal cancellation charges be submitted at the earliest possible date.

At the time that Van Buren received defendant's direction to hold up production, a total of 201,821 yards of grey goods under contract had been completed by Monticello. Of this quantity 165,630 yards had been sent to the finisher in Lanett, Alabama, and 112,184 yards had been dyed in the colors requested by defendant. None of the duck material had been shipped to defendant. Upon cancellation of the contract, Van

Buren, after notifying defendant, sold the grey and finished goods upon the open market at the best prices obtainable; this transaction resulted in a loss of $10,224.59 to Van Buren.

During the entire period material hereto, cotton duck goods was the subject of price regulation by the OPA under MPR 127. Said prices were usually modified monthly. On August 15, 1946, several amendments to MPR 127 were adopted.

Defendant contends generally that plaintiff has failed to allege or prove a valid enforceable contract. More specifically it argues that (a) no oral contract of sale of goods was made on August 13, 1946; (b) assuming the existence of such oral contract, there was no sufficient memorandum to satisfy the Illinois Statute of Frauds, Ch. 121½, Sec. 4, Smith-Hurd Anno.Stats.; (c) assuming the existence of such oral contract, and, assuming further, that a sufficient memorandum was made to satisfy the Statute of Frauds, the contract sued on was illegal and unenforceable because, either in its inception or in its performance, it violated Maximum Price Regulation 127, as amended.

■ On this first point, we think that there is sufficient credible evidence to sustain the district court's findings that an oral contract was in fact made on August 13, 1946.

The second point was the principal defense relied on by defendant below. Defendant made a formal motion to dismiss the second amended complaint based upon the defense of the statute of frauds. The question was argued before the court, and was taken under consideration. In a carefully considered opinion the district court decided that Exhibits A through H attached to the second amended complaint and all signed by defendant constituted sufficient memoranda of the oral contract so as to satisfy the statute of frauds. The court relied on such cases as Western Metals Co. v. Hartman Ingot Metal Co., 303 Ill. 479, 482, 135 N.E. 744, and Mayer v. Hirsch, Stein & Co., 212 Ill.App. 441, 443. This defense is again argued on this appeal, but it is sufficient to say that we think the district

court was correct in determining that recovery upon the oral contract was not barred by the Illinois statute of frauds.

On this appeal the defendant relied principally upon the defense of illegality. We encounter some difficulty in considering this defense because it is apparently somewhat of an afterthought. Under Rule 8(c), Federal Rules of Civil Procedure, 28 U.S.C.A., the defense of illegality should be set forth affirmatively. Although defendant's answer did set forth three affirmative defenses, illegality was not one of them. However, it cannot be said that this defense was not litigated in the court below, as defendant did request findings of fact and conclusions of law based upon the defense of illegality, and briefs were filed with the trial court urging and contesting that defense.

Assuming the existence of the contract as found by the district court, defendant advances several reasons why it was illegal. Defendant argues that the prices which Van Buren was to receive for the cotton goods were over the ceiling prices provided by MPR 127, and therefore illegal. It should be noted that Van Buren had never sent defendant an invoice, as defendant repudiated its contract before any of the goods were shipped to defendant. However, based upon the amounts sued for in this action, for loss of profits, defendant says that the contract was illegal from its inception.

■ The court found and substantial evidence sustains findings that Van Buren intended to sell the merchandise at the ceiling prices at such times as the goods would have been manufactured and ready for shipment. The contract was not illegal because the amount of the ceiling price was uncertain at the time the contract was first made. We think the situation is similar to that in Socony-Vacuum Oil Co., Inc. v. Allied Oil Corp., 7 Cir., 178 F.2d 239, where this court held that instead of being a contract calling for over-ceiling prices, it showed that it was designed to comply with rather than to violate the Price Control Act.

In the case at bar the testimony showed, and the court so found, that the word, "Ad-

vise," during the months of August, September and October, 1946, when used in a purchase order in the cotton goods business, meant that the sale was to be at OPA ceiling prices. This was further evidence of the intention of the parties to comply with rather than violate the Price Control Act. We think there was nothing fundamentally illegal in the contract.

■ As further proof of its claim that the contract was illegal, defendant cites several sections of MPR 127. First it claims Van Buren was not entitled to any mark-up because Sec. 1400.82(i) (2) (iii) denied mark-ups to jobbers who commenced business after September 1, 1944. It points out that Van Buren was organized July 1, 1946, and jumps to the conclusion that the quoted section of the regulation applies.

This illustrates the danger of attempting to try out issues for which there is no basis in the pleadings. Plaintiff points out that a jobber could change its form of organization without losing its mark-up privileges, citing 2 Pike & Fischer O.P.A. Price Service, Consumers Goods Desk Book, p. 11,187. Plaintiff claims that had it been advised of defendant's contention by pleading or otherwise, it could have proved that a partnership with the same name and ■ with the same interests had been a well-known jobbing firm in Chicago since 1934. We hold that defendant, neither having raised this defense in the pleadings nor until after the plaintiff had finished its proof, cannot now assert a violation of that section of the regulation to prevent a recovery upon the contract.

Plaintiff also claims that Van Buren was not entitled to a mark-up under Sec. 1400.82 (i)(2)(v), claiming that the facts showed that Van Buren was a converter-jobber. This was a question of fact which the trial court found against the defendant. It is also contended that no mark-up should be allowed under Sec. 1400.82(i)(2)(vii). An examination of the regulation and the testimony convinces us that defendant's contention in this respect is without merit.

■ It is of course well established that findings of a trial court may not be set aside unless clearly erroneous. The learned trial judge gave careful consideration to the various claims of the defendant in light of the evidence which had been received. Such findings as are critical in the determination of the questions before us are substantiated by substantial credible evidence. We think that the legal conclusions which were drawn were correct and the judgment is therefore affirmed.