FREE–FLOW MUFFLER COMPANY, Appellant,

v.

E. A. KLIEWER, Sr., Appellee.

No. 6805.

Court of Civil Appeals of Texas. Texarkana.

Sept. 22, 1955.

Rehearing Denied Oct. 27, 1955.

Smead & Harbour, William Hurwitz, Longview, for appellant.

Earl Roberts, Longview, Blalock, Clower, Lohman & Kliewer, Dallas, for appellee.

DAVIS, Justice.

Appellee, E. A. Kliewer, Sr., hereinafter referred to as Kliewer, filed suit against Free-Flow Muffler Company, a Texas corporation hereinafter referred to as the Corporation, for royalties alleged to have accrued under a license issued by Kliewer to the Corporation upon a patent for an improved type muffler for automobile, truck, bus and combustion engines. During the pendency of the suit, the Corporation was dissolved, and by amended pleading Kliewer sued the Corporation in disso-

lution and Tom Cook, L. C. Hoffman and Faye Myers, a feme sole, each individually and as trustees of the affairs of the Corporation in dissolution. Kliewer alleged a contract between himself and the Corporation dated July 30, 1947. The evidence shows the final certificate of dissolution of the Corporation was issued some time in March 1951.

Prior to the execution of the contract dated July 30, 1947, appellee had been issued patent No. 2,392,989, dated January 15, 1946, for the improved type muffler. On June 14, 1946, Kliewer, Tom Cook and L. C. Hoffman agreed to and did form a corporation for the manufacture of mufflers under the letters patent and improvement patent to be known as "Free-Flow Mufflers" and a charter was issued on June 20, 1946. Capital stock of the Corporation was pledged at $9,000, and a contract was entered into, January 10, 1947, whereby Kliewer contributed his letters patent for a consideration of $3,000 of stock in the Corporation. This contract did not provide for the payment of royalty to Kliewer. The consideration to him was one-third of the profits of the Corporation. The manufacture of mufflers was commenced some time in 1946. When the contract dated July 30, 1947 was entered into, Kliewer was paid $3,000 in cash for his stock in the Corporation, and the contract (license agreement) provided for a royalty of 25¢ on each muffler sold. After July 30, 1947, the Corporation commenced the manufacture of mufflers under the license agreement, and, according to the findings of fact of the trial court, continued until or shortly prior to the date of dissolution of the Corporation.

The pertinent parts of the contract involved in this suit are as follows:

"License Agreement.

"This Agreement, executed by and between E. A. Kliewer, Sr., of Gregg County, Texas, herein called Licensor, and Free-Flow Muffler Company, a Texas corporation having its principal place of business in Gregg County, Texas, herein called Licensee:

Witnesseth:

"Whereas, Licensor is the sole owner of Letters Patent of the United States of America, No. 2,392,989, dated January 15, 1946, for an improved type muffler for automobile, truck, bus and combustion engines; and

"Whereas, heretofore, on the 10th day of January 1947, Licensor, one of the incorporators of Licensee, executed and delivered to Licensee an exclusive License to manufacture and sell mufflers manufactured pursuant to the above described Letters Patent, in consideration for which Licensor received, and is the owner of 300 shares of common capital stock of Licensee; and

"Whereas, it is the desire of Licensee to enter into a license agreement with Licensor which shall be substituted for and in lieu of the License Agreement dated January 10, 1947, and to purchase from Licensor the 300 shares of the common capital stock of Licensee owned by Licensor;

"Now, Therefore, the parties have agreed as follows:

"1. Licensor does hereby grant to Licensee for the period of the life of the above described Letters Patent No. 2,392,-989, the sole and exclusive license to manufacture and sell mufflers manufactured under said Letters Patent, together with the sole and exclusive license to manufacture and sell mufflers manufactured under any improvement patent issued to, or improvement application for patent filed by Licensor. Licensee shall be entitled to the benefit of any research which Licensor may choose to conduct incident to the improvement of the muffler, and any research shall become the property of Licensee.

"2. Licensee shall pay to Licensor a royalty of twenty-five cents ($0.25) on each and every muffler which Licensee sells or causes to be sold.

\*　　\*　　\*　　\*　　\*　　\*

"7. In event of the breach by Licensee of any of the covenants contained in this agreement, and if such breach not be cor-

rected and remedied within sixty (60) days after it occurs, Licensor shall have the right, at his election, to terminate the license herein granted, in which event this agreement shall thereafter be of no further force or effect and the rights herein granted to Licensee shall revert to and become the property of Licensor. If Licensee shall voluntarily discontinue the manufacture and sale of mufflers for a period of sixty (60) consecutive days, the license herein granted shall terminate and all rights hereunder shall revert to and become the property of Licensor.

\* \* \* \* \* \*

"9. Licensee shall not assign this license or any part thereof without the written consent of Licensor.

"10. For and in consideration of the sum of three thousand ($3,000) dollars, the receipt of which is hereby acknowledged, Licensor does hereby sell, assign and transfer to Licensee three hundred (300) shares of the common capital stock of Licensee, being all of the common capital stock of Licensee owned by Licensor, and represented by Certificate No. 7, which has been duly transferred by Licensor to Licensee contemporaneously with the execution of this Agreement. As a further consideration for such transfer, Licensee expressly agrees to indemnify and save harmless Licensor from any and all debts, liabilities or causes of action held or owned by third persons and which may be asserted against licensee.

"11. This Agreement shall supersede and be in lieu of the said License Agreement dated January 10, 1947."

On June 2, 1948, the Corporation executed and acknowledged a contract with Hancock Manufacturing Company, a corporation of Toronto, Ohio, hereinafter referred to as Hancock, and Hancock executed and acknowledged the same on September 29, 1948, wherein and whereby Hancock bound and obligated itself to manufacture and deliver to the Corporation for its exclusive use mufflers covered by Kliewer's letters patent, improvements thereon, developments and variations thereof.

On July 1, 1948, Kliewer executed an instrument giving his written consent for Hancock to manufacture such mufflers under said letters patent, together with all improvements thereon, developments and variations thereof, acquired by said Corporation.

On July 11, 1949, the Corporation caused a letter to be written by its attorney to Kliewer, which reads as follows:

"William Hurwitz
"Attorney at Law
"Suite 303 Bramlette Building
"Longview, Texas.
"July 11, 1949
"Mr. E. A. Kliewer, Sr.
"508 East North Street
"Longview, Texas
"Re: E. A. Kilewer-Free-Flow
"Muffler Company, Contract dated July 30, 1947—U. S. Letters Patent No. 2,392,989.
"Dear Mr. Kliewer:
"The Free-Flow Muffler Company has requested me to advise you that is has discontinued the manufacture and sale of mufflers under the above referred to Contract and Letters Patent for a period in excess of 60 consecutive days, and that it will no longer manufacture and sell mufflers covered by said Contract and Letters Patent.
"In accordance with the terms of the above referred to agreement the same has been terminated and you may use this letter as a release to you of the license granted by such agreement to the Free-Flow Muffler Company.
"Yours truly,
"/s/ Wm. Hurwitz
"Wm. Hurwitz.
"WH/f
"CC: Mr. E. A. Kliewer, Jr.
"c/o Blalock, Blalock, Lohman and Blalock.
"Gulf Building
"Houston, Texas

"Mr. Tom Cook, President
"Free-Flow Muffler Company
"Longview, Texas."

There is no evidence that the letters patent were ever returned, or offered to be returned to Kliewer. By the letter, the Corporation attempted to repudiate the contract. Suit followed and trial was to the court who made extensive findings of fact and conclusions of law, and although doing so lengthens this opinion, we think it advisable to copy them at length herein. The reason for copying these findings of fact and conclusions of law is that they are so clear and concise in every detail and are decisive of this case. Omitting the captions and signature, they are as follows:

"Findings of Fact.

"1. Plaintiff, Kliewer, the owner of U. S. Patent No. 2,392,989, dated January 15, 1946, for a muffler, and defendants, Tom Cook and L. C. Hoffman, organized the defendant, Free-Flow Muffler Company, a Texas corporation (herein called Corporation) on June 20, 1946, for the purpose of manufacturing and selling mufflers pursuant to such patent and improvements thereon. The corporation had a capitalization of $9,000.00, owned equally by Kliewer, Cook and Hoffman. Cook and Hoffman paid for their stock in cash. Kliewer paid for his stock by executing to the Corporation an exclusive license to manufacture mufflers, dated January 10, 1947 (Defendants' Ex. 3).

"2. Thereafter, by consent of Kliewer, Cook and Hoffman, the plaintiff, Kliewer, and the defendant, Free-Flow Muffler Company, executed and entered into the agreement dated July 30, 1947, which forms the subject matter of this lawsuit (Plaintiff's Ex. 1).

"3. Continuously from January 10, 1947, to March, 1951, the date of dissolution of defendant, Free-Flow Muffler Company, said defendant manufactured and sold mufflers or caused mufflers to be manufactured and sold for its account.

"4. During the period beginning January 10, 1947, and ending more than sixty (60) days prior to June 11, 1949, the design of the muffler being manufactured and sold was, from time to time, altered. The record is silent as to the nature of these changes in design, there being no evidence on this point. However, it sufficiently appears, and I find, that such alterations in design were made with the concurrence and consent of the plaintiff and the defendants, Free-Flow Muffler Company, Tom Cook and L. C. Hoffman, that the defendants never claimed, prior to July 11, 1949, that the mufflers being manufactured and sold were not within the coverage of the agreements of January 10, 1947 and July 30, 1947.

"5. The mufflers sold or caused to be sold by the defendant, Free-Flow Muffler Company, for the period July 1, 1949 to date of dissolution of the corporation were the equivalent of mufflers within the technical scope of plaintiff's patents, applications for patents and research.

"6. The attorney for Free-Flow Muffler Company sent to plaintiff the letter dated July 11, 1949 (Plaintiff's Ex. 6) undertaking to terminate the agreement of July 30, 1947.

"7. Regardless of whether the type or types of mufflers manufactured by defendant Free-Flow Muffler Company from July 30, 1947 to July 1, 1949, were within the technical scope and claims of plaintiff's patent, improvement patent and research, (covering which the record is silent) defendant, Free-Flow Muffler Company, accounted to plaintiff for royalty on such mufflers under the terms of the agreement of July 30, 1947. No change occurred on July 11, 1949 in the type of mufflers manufactured by Free-Flow Muffler Company, no such change occurred within sixty days prior to that date, and no change in the type of muffler occurred subsequent to that date.

"8. The parties adopted the trade name 'Free-Flow' for the mufflers manufactured by Free-Flow Muffler Company beginning January 10, 1947.

"9. Free-Flow Muffler Company was never licensed to manufacture mufflers under any patent, improvement patent, improvement application for patent or re-

search other than under the agreements of January 10, 1947 and July 30, 1947.

"10. The mufflers sold by the defendant, Free-Flow Muffler Company, from January 10, 1947 to date of dissolution of Free-Flow Muffler Company, were called by such defendant and sold to and known by the trade as 'Free-Flow Mufflers.'

"11. The mufflers sold by the defendant, Free-Flow Muffler Company, from January 10, 1947 to date of dissolution of the defendant, Free-Flow Muffler Company, were packaged in cartons upon the outside of which were stenciled the words 'Free-Flow' and 'patented.'

"12. I find that plaintiff's patents were never invalidated, and that defendant, Free-Flow Muffler Company was never evicted from its use and enjoyment of plaintiff's patents under the agreement of July 30, 1947.

"13. Defendant, Free-Flow Muffler Company, failed and refused to account to plaintiff for the royalty of twenty-five cents (25¢) provided by the agreement of July 30, 1947 on each muffler sold on and after July 1, 1949 down to date of dissolution of Free-Flow Muffler Company.

"14. From July 1, 1949 to the date of dissolution of the defendant, Free-Flow Muffler Company, the defendant, Free-Flow Muffler Company sold 24,712 mufflers of which 1007 mufflers were returned and 984 mufflers were returned as defective, leaving a net of 22,181 mufflers sold for the mentioned period.

"15. The defendant, Free-Flow Muffler Company, was dissolved in March 1951; at the date of its dissolution the defendant, Tom Cook, was the president of the corporation and the defendants, Tom Cook, L. C. Hoffman and Faye Myers, a feme sole, were all of the members of the last Board of Directors of the corporation.

"16. On the dissolution of the defendant, Free-Flow Muffler Company, all of the assets of the dissolved corporation were distributed to the defendants, Tom Cook and L. C. Hoffman, who were two of the stockholders of the corporation, with the consent of the last president and Board of Directors of the corporation.

"17. The book value of the assets of the dissolved corporation, Free-Flow Muffler Company, at the time of dissolution was Thirteen Thousand Nine Hundred Forty and 70/100 Dollars ($13,940.70).

"18. The defendants, Tom Cook and L. C. Hoffman, to whom the assets of Free-Flow Muffler Company were delivered, sold such assets to Ben H. Cook and Thomas Davidson for a consideration of Thirteen Thousand Nine Hundred Forty and 70/100 ($13,940.70) represented by promissory notes payable to the defendants, Tom Cook and L. C. Hoffman, respectively, in the total amount of Thirteen Thousand Nine Hundred Forty and 70/100 Dollars ($13,940.70). The consideration for the assets represented by such promissory notes has been substantially paid off and such monies have been claimed by the defendants, Tom Cook and L. C. Hoffman, respectively, as their sole property.

"19. On the date of dissolution of the defendant, Free-Flow Muffler Company, the total indebtedness and liabilities of said corporation to creditors was Five Thousand Three Hundred Thirty-seven and 33/100 Dollars ($5,337.33) representing the unpaid balance of certain promissory notes executed to the defendants, Tom Cook and L. C. Hoffman.

## "Conclusions of Law.

"1. The agreement of July 30, 1947 (Plaintiff's Ex. 1) is not ambiguous. Such agreement expressly required the defendant, Free-Flow Muffler Company to account to plaintiff for 25¢ royalty on each and every muffler said defendant sold or caused to be sold. I conclude that this royalty was payable regardless of whether the mufflers sold or caused to be sold were technically within the coverage of plaintiff's patents and research.

"2. If my conclusion that the agreement of July 30, 1947 is not ambiguous is erroneous, I conclude that the parties to that

agreement, by their actions and course of conduct over the period from July 30, 1947 to July 11, 1949, construed the agreement to require the payment to plaintiff of the stipulated royalty regardless of whether the mufflers sold or caused to be sold by the defendant, Free-Flow Muffler Company were technically within the coverage of plaintiff's patent and research.

"3. The mufflers sold or caused to be sold by defendant, Free-Flow Muffler Company during the period July 1, 1949 to date of dissolution of said corporation were the equivalent of mufflers within the technical scope of plaintiff's patents, applications for patents and research, within the doctrine of equivalents and, therefore, I further conclude that plaintiff, under the agreement of July 30, 1947 is entitled to royalty on those mufflers in the same manner as though they were constructed precisely within the technical scope of such patents, applications and research.

"4. Defendants are estopped to deny the liability of Free-Flow Muffler Company to plaintiff for the royalty of 25¢ on each of the net 22,181 mufflers sold or caused to be sold by Free-Flow Muffler Company during the period July 1, 1949 to date of dissolution of said company.

"5. The defendants, Tom Cook, L. C. Hoffman and Faye Myers, a feme sole, the last Board of Directors of Free-Flow Muffler Company, a dissolved corporation, and defendant Tom Cook, the last president of said corporation, breached the trust placed upon them by Article 1388, by jointly distributing the assets of the dissolved corporation to the defendants, Tom Cook and L. C. Hoffman, to the prejudice of plaintiff, a creditor of the dissolved corporation. Such distribution constituted a conversion of the assets of the corporation, rendering the said trustees jointly and severally liable to the creditors and stockholders of the corporation to the extent of such assets.

"6. The defendants, Tom Cook and L. C. Hoffman, breached the trust placed upon them by Article 1388 by selling, as their own property, the assets of the dissolved corporation, Free-Flow Muffler Company, to Ben H. Cook and Thomas Davidson. By such sale, and by appropriating to their own use the consideration for the sale, the defendants, Tom Cook and L. C. Hoffman, converted such assets.

"7. The value of the converted assets was $13,940.70, for which amount the defendants, Tom Cook, L. C. Hoffman and Faye Myers, a feme sole, are severally liable to the creditors and stockholders of the corporation.

"8. The creditors of the dissolved corporation, Free-Flow Muffler Company are entitled to preference over the stockholders.

"9. As the total debts owed by the corporation to all creditors other than plaintiff was $5,337.33, the plaintiff is entitled to judgment against the defendants, jointly and severally, for the full amount stated below.

"10. Plaintiff is entitled to judgment against all defendants, jointly and severally, for the sum of $5,542.25, with interest at 6% from the date of entry of the judgment."

The trial court made additional findings of fact as follows:

"Findings of Fact.

"1.

"U. S. Letters Patent, No. 2,392,989, dated January 15, 1946, and U. S. Letters for Improvement Patent, No. 25,005,511, dated March 14, 1950, were issued to E. A. Kliewer, Sr., Plaintiff.

"2.

"On January 10, 1947, in consideration of 300 shares of the capital stock of the par value of $10.00 per share, Free-Flow Muffler Company acquired from Plaintiff, E. A. Kliewer, Sr., an exclusive license to manufacture and sell mufflers manufactured pursuant to Letters Patent of the United States of America No. 2,392,989, dated January 15, 1946.

"3.

"The contract of July 30, 1947, was entered into by Plaintiff and Defendant Corporation under the expressly imposed condition by Plaintiff that Plaintiff's son and attorney prepare said contract.

"4.

"That said contract of July 30, 1947, was prepared by the son and attorney of Plaintiff and the same was executed by Plaintiff and Defendant Corporation without submission of same to an attorney other than Plaintiff's son and attorney.

"5.

"Defendant Corporation caused the letter of July 11, 1949, (Plaintiff's Exhibit '6') to be sent to Plaintiff and his son and attorney, which letter was received by them in due course of the mail.

"6.

"From and after July 30, 1947, and to and including June 30, 1949, Plaintiff claimed and Defendant paid royalties on defective mufflers, based on the assertion by Plaintiff that he was entitled to same as the inventor and licensor of said mufflers."

Appellants requested further findings of fact which were refused.

Judgment was for appellee in keeping with the trial court's findings of fact and conclusions of law, hence the appeal.

Appellants bring forward 19 points of error. By points 1, 10, 11, 13, 14, 15 and 16 they complain of various findings of fact by the trial court. We have carefully examined the statement of facts and find that the fact findings complained of in the enumerated points are fully supported by the evidence, therefore the points enumerated are without merit and are respectfully overruled.

By points 6, 7, 8, 17 and 18 appellants complain of the refusal of the court to make certain specially requested findings of fact. From a careful examination of the statement of facts we are unable to find where such specially requested fact findings were supported by the evidence, therefore these enumerated points are without merit and are respectfully overruled.

By points 2, 3, 4, 5, 12 and 19 appellants complain of certain conclusions of law by the trial court. By point 2, they complain of the conclusion of the trial court that the license agreement expressly required the Corporation to account to Kliewer for 25¢ royalty on each and every muffler the Corporation sold or caused to be sold and that such royalty was payable regardless of whether the muffler sold or caused to be sold were technically within the coverage of Kliewer's patent and research.

Kliewer, Cook and Hoffman commenced the manufacture of mufflers some time in 1946, and continued to do so under the contract and license agreement of January 10, 1947, until the execution of the contract and license agreement dated July 30, 1947. The evidence shows that Kliewer continued his research for still a better improved muffler prior to the time the contract involved here was executed (July 30, 1947) and an application for an improvement patent was on file at that time, upon which a patent was subsequently granted, being patent No. 25,005,511, dated March 14, 1950.

The evidence shows that the mufflers manufactured from January 10, 1947 were never precisely within the terms of the original patent or within the terms of the application for the improved patent, but it fails to reflect to what extent they differed. It was a further known fact to appellants that Kliewer was continuing his research and had discussed with them from time to time the changes that were made in the muffler. There is no evidence that a single change was made in the design of the muffler that did not come within the research of Kliewer, the patentee. The evidence is conclusive that all changes made in the design of the muffler were made more than 60 days prior to the date of the letter in which the Corporation attempted to repudiate the contract. These conditions are pointed out because the court was entitled

to take into consideration the surrounding circumstances when the contract was entered into, the situation of the parties, and of the subject matter of the instrument. In Ryan v. Kent, Tex.Com.App., 36 S.W.2d 1007, 1010, opinion approved by the Supreme Court, Judge Leddy said:

"In ascertaining whether the parties to this contract intended that the lease should be continued by production from wells producing oil at the time it was executed, we may look to the surrounding circumstances when the contract was entered into, the situation of the parties, and of the subject-matter of the instrument (Lipscomb v. Fuqua, 103 Tex. 585, 131 S.W. 1061; Borden v. Patterson, 51 Tex.Civ.App. 173, 111 S.W. 182), and this regardless of whether the language used in said contract be ambiguous. Hoffer Oil Corp. v. Hughes, Tex.Civ.App., 16 S.W.2d 901; Dublin [Electric & Gas Co.] v. Thompson, Tex.Civ.App., 166 S.W. 113.

"A clear statement of this rule is that made in Reed v. Insurance Co., 95 U.S. 23, 30, 24 L.Ed. 348, wherein the court said: 'Although a written agreement cannot be varied (by addition or subtraction) by proof of circumstances out of which it grew and which surrounded its adoption, yet such circumstances are constantly resorted to for the purpose of ascertaining the subject-matter and the standpoint of the parties in relation thereto. Without some knowledge derived from such evidence, it would be impossible to comprehend the meaning of an instrument, or the effect to be given to the words of which it is composed. This preliminary knowledge is as indispensable as that of the language in which the instrument is written. A reference to the actual condition of things at the time, as they appeared to the parties themselves, is often necessary to prevent the court, in construing their language, from falling into mistakes and even absurdities. * * * "It may, and indeed it often does, happen, that, in consequence of the surrounding circumstances being proved in evidence, the courts give to the instrument, thus relatively considered, an interpretation very different

from what it would have received, had it been considered in the abstract. But this is only just and proper; since the effect of the evidence is not to vary the language employed, but merely to explain the sense in which the writer understood it." ' "

■ It appears to us from the facts and circumstances hereinabove stated as well as from the actual phraseology of the contract itself that the trial court's conclusion was correct. We further note that there is no allegation that the contract is ambiguous, and when one considers the contract from its four corners without resort to any subtle or forced construction, we are unable to see how any other conclusions could be reached.

In Brown v. Brown, Tex.Civ.App., 245 S.W.2d 995, 997, w/r, we find the following:

"A written instrument, not alleged to be ambiguous, must be construed so as to carry out the primary intent of the parties. It must be considered as a whole and given its reasonable, natural and probable meaning. It must be interpreted according to the obvious import of its language without resorting to a subtle or a forced construction. One clause cannot be considered by itself; every clause must be considered with reference to the whole instrument as well as with reference to every other clause. Southern Travelers' Ass'n v. Wright, Tex. Com.App., 34 S.W.2d 823; Southwestern Life Ins. Co. v. Houston, Tex.Civ.App., 121 S.W.2d 619, error refused; Pagel v. Pumphrey, Tex.Civ.App., 204 S.W.2d 58, writ refused; Green v. Farmers & Merchants State Bank, Tex.Civ.App., 100 S.W.2d 132, writ refused; Guardian Trust Co. v. Bauereisen, 132 Tex. 396, 121 S.W.2d 579."

The contract provides in part in Sec. 1: "*Licensee shall be entitled to the benefit of any research which Licensor may choose to conduct incident to the improvement of the muffler, and any research shall become the property of Licensee.*" (Emphasis ours.) Sec. 2 of the contract provides: "*Licensee shall pay to Licensor a royalty of twenty-five cents ($0.25) on each and every muffler which Licensee sells or causes*

*to be sold."* (Emphasis ours.) Certainly it could not be said that the licensee could change the design of the mufflers as a result of the research of the licensor and defeat licensor's right to the royalty. Therefore, when Sec. 2 of the contract is construed in connection with all the provisions, as well as the actual wording of Sec. 2, we find the trial court's construction to be correct.

Appellants rely heavily upon the case of Strong v. Carver Cotton Gin Co., 197 Mass. 53, 83 N.E. 328, 330, 14 L.R.A.,N.S., 274. As we view this case, appellants have placed an erroneous construction upon the court's holding. It is the contention of appellant that this case holds that no royalty can be collected on any patented item unless it comes within the technical scope of the patent and license agreement. Upon the first appeal of this case judgment of the trial court was reversed because of the exclusion of some of the evidence offered by the defendant. On a subsequent trial the patentee recovered a judgment for the royalties and this judgment was affirmed. Strong v. Carver Cotton Gin Co., 202 Mass. 209, 88 N.E. 582. In construing the contract in that case the court said:

"So far we have dealt with the contract when it was entirely executory. When the time came for action under it and the manufacture of a particular machine was proposed, new questions would arise. It might well be a matter of doubt, especially with the imperfect knowledge of the facts that the parties had, whether such a machine was covered by the patent. If, then, the parties agreed expressly or impliedly, or assumed by their contract, that a certain machine was covered by the patent, that would be competent evidence of the fact if the matter was doubtful and was litigated. Still further, it is competent for one to agree to pay a patentee a royalty for a license to manufacture a particular machine when he is uncertain whether it is covered by a patent or not. His payment in such a case, is for exemption from disturbance and the possibility of disturbance by the patentee. Buss v. Putney, 38 N.H. 44; Heaton-Peninsular [Button-Fastener] Co. v. Eureka

[Specialty] Co., [6 Cir.] 77 F. [288] 290, 25 C.C.A. 267, 35 L.R.A. 728. If he makes an agreement of that kind, it is no defense to a suit for royalties that the patent is invalid, or that his machine is not covered by it. White v. Lee, C.C., 14 F. 789; Marston v. Swett, 82 N.Y. [526] 528; McKay v. Smith, C.C., 39 F. 556; National Rubber Co. v. Boston Rubber-Shoe Co., C.C., 41 F. 48; Pope Mfg. Co. v. Owsley, C.C., 27 F. [100] 108. See, also, Eureka Co. v. Bailey Co., 11 Wall. 488 [78 U.S. 488], 20 L.Ed. 209. He has and enjoys that which he pays for, namely, immunity from any claim under the patent. The patentee gives up that which might be valuable, namely, the right to prosecute for an infringement. So, under a contract like that between these parties, if the manufacturer says, I will manufacture this machine and treat it as covered by the patent, and the other party assents, he is bound by his agreement so long as he acts under it. It has been said in some cases that he is estopped from denying that what he manufactures under such an arrangement is covered by the license. Andrews v. Landers, C.C., 72 F. 666; Sproull v. Pratt, & Whitney Co., C.C., 97 F. 807. The same principle has also been applied to hold the defendants liable as licensees in the following cases: Covell v. Bostwick, C.C., 39 F. 421; Pope Mfg. Co. v. Owsley, C.C., 27 F. 100–108; Milligan v. Lelance, etc., Co., C.C., 21 F. 570; Kirkpatrick v. Pope Mfg. Co., C.C., 64 F. 369. See, also, Eureka Co. v. Bailey Co., 11 Wall. 488 [78 U.S. 488], 20 L.Ed. 209; Jones v. Van Kirk, Fed.Cas.No. 7,500, 2 Fish.Pat.Cas. 586."

The contention of appellants that they manufactured the mufflers under the erroneous assumption that they came within the patent or improvement patent of the patentee until about 60 days prior to July 11, 1949, is not supported by the evidence. Neither is the contention of appellants that Kliewer led them to believe that the mufflers manufactured at any time came within the specific terms of the patent or improvement patent. But there is no contention that the mufflers manufactured do not come within the research of Kliewer. We find in the

case note to the case of Strong v. Carver Cotton Gin Co., supra, in 14 L.R.A.,N.S., 274, the following:

"Case Note.—Validity and effect of agreement to pay royalties on device not in fact covered by a patent, but assumed to be so covered.

"This note is confined to those cases which deal with the question of the validity and effect of an agreement entered into by a licensee and the owner of a patent, whereby the former agrees to pay royalties on a device manufactured by the owner, on the assumption that the device is protected by the patent, when, in fact, it is not so protected. Those cases, therefore, in which a patent does in fact cover the device, but has been for some reason held invalid, are excluded. So, those cases have been excluded where the licensee manufactures a device slightly different from the one patented, and in that manner tries to escape the effect of his agreement for the payment of royalties.

"The holding in Strong v. Carver Cotton Gin Co., that a licensee of a right to use a device under a patent may be required to pay royalties on a device which is not in fact within the protection of the patent, so long as the parties treat it as within such protection, seems to be in accord with practically all the cases found on this question.

"Thus, in Sproull v. Pratt & W. Co. [C.C.], 97 F. 807, it was held that, where a licensee agreed to manufacture a certain article under a patent and stamped it with the date thereof, and thereafter advertised it as being made under the patent, and paid over royalties under that theory, such licensee would be estopped to set up as a defense to a claim for further royalties that the article as made was not covered by the patent.

"In Kirkpatrick v. Pope Mfg. Co. [C.C.], 64 F. 369, where a contract was entered into between the patentee and his licensee for the manufacture of a certain device and the payment of certain royalties thereon, and it appeared that, because of a narrow construction by the court in a collateral proceeding, the patent did not cover all the articles manufactured, it was held that, since all the articles had been marked and sold as covered by the patent, and the original contract had been made with the understanding that the patent covered them, and no modification of that contract had been made, the patentee was entitled to recover royalties on all the articles sold. A similar case, and holding to the same effect, is Covell v. Bostwick [C.C.], 39 F. 421.

"In Eureka Clothes Wringing Mach. Co. v. Bailey Washing & Wringing Mach. Co., 11 Wall. 488, 20 L.Ed. 209, it was recognized that a company which agrees to pay a sum as a royalty for the use of a patented machine cannot, in an action to recover such sum, set up that the machine is not covered by the patent, where it does not attempt to show that the agreement was obtained by fraud, surprise, or imposition.

"In Shaw v. Soule [C.C.], 20 F. 790, where a certain patent, covering ony part of a device, was represented and assigned as covering the whole device, it was held, in an action by the patentee to recover a blance due as royalties, that, since the assignees had proceeded upon the contract so far as to affirm it, a misrepresentation and concealment as to the part not covered by the patent would not constitute a defense in this suit.

"In Andrews v. Landers [C.C.], 72 F. 666, it was held that a manufacturer who had a license to make certain articles, but who, in fact, made articles of a different pattern, stamping them, however, as being made under the patent, and paying the license fees thereon for several years, was estopped to allege that such device did not contain the patented improvement. In this case it does not appear whether the article manufactured was assumed to be made under the patent or not.

"Other very similar cases, and holding to the same effect, are Kroegher v. McConway & T. Co., 149 Pa. 444, 23 A. 341; Milligan v. Lalance & G. Mfg. Co. [C.C.], 21 F. 570.

"In Keith v. Electrical Engineering Co., 136 Cal. 178, 68 P. 598, where a person being an inventor of an improved armature for a dynamo-electric machine, sold to the defendant the right to make and sell the invention in certain states, the latter agreeing, as alleged, to pay a royalty on the sale 'of the articles manufactured by said defendant under said letters patent,' it was held that the patentee was entitled to a royalty on the selling price of the entire dynamo-electric machine, with the armature attached, and not merely of the armature alone,—especially where it appeared that at first the parties themselves so interpreted the contract.

"When, however, the manufacturer had repudiated the contract, and has ceased to mark the articles as being made under the patent, the rule is otherwise.

"Thus, in Dutchess Tool Co. v. Kolb, 44 App.Div. 624, 60 N.Y.S. 94, a manufacturing company contracted with the owner of letters patent to pay a royalty to manufacture a patented article, which consisted of 'the combination of oven door,' with the apparatus for automatically lighting the oven when open. A few years thereafter the manufacturer found that the patent did not cover the door independent of the device used in combination with it. It appeared that at no time had it manufactured any of the devices which would come within the patent, but instead, it had manufactured articles which, in combination with the door, were of its own device, and had put thereon the name of the patentee. On this combination it paid a royalty for several years, and then, on not being able to agree on the price, gave notice that no more devices would be made under a royalty, and thereafter give its article a different name. It was held, in an action at law, that the fact that the manufacturer had previously paid royalties under a mistake, or because of imaginary benefits, did not prevent it from repudiating the contract, and continuing to manufacture the articles, upon learning that they were not covered by the patent, nor render it liable for articles manufactured after such repudiation of the contract, where the articles were not sold with any pretense that they were protected by the patent of the other party.

"The following cases, although not strictly in point, are closely analagous to the question here annotated:

"In Ingraham v. Schaum, 157 Pa. [88], 89, 27 A. [404], 407, it was held that, where a person had agreed to pay royalties on all sales that he might make of a device on which the plaintiff had applied for a patent, he cannot allege as a defense in an action for the royalties that, after the agreement was entered into, a patent for the device was refused by the patent office.

"But in Hamilton v. Park & McK. Co., 125 Mich. 72, 83 N.W. 1018, a contract which provided for the payment of yearly royalties to an inventor for the exclusive right to manufacture a device for which a patent was expected to be issued, was held to be void for want of subject-matter so as to defeat a suit for the recovery of royalties, where, at the time of its execution, the application for a patent had been rejected by the officers of the patent department because third persons had previously patented the same device."

We think the strongest case in support of the conclusion reached by the trial court on the point raised here is the case of Hazeltine Research v. Automatic Radio Mfg. Co., D.C., 77 F.Supp. 493, affirmed, 1 Cir., 176 F.2d 799, affirmed 339 U.S. 827, 70 S.Ct. 894, 94 L.Ed. 1312, 1317, and urge a careful study of that opinion. We conclude that the record and the law are against appellants on their point 2 and it is respectfully overruled.

By point 3 appellants complain of the action of the trial court in concluding that Kliewer was entitled to judgment against all defendants, jointly and severally, for the sum of $5,542.25, with interest at 6% from date of entry of judgment. The chief argument of appellants on this point was because of the erroneous construction of the contract by the trial court and it was argued in connection therewith. What we have

said in connection with point 2 disposes of this point and it is overruled.

By point 4 appellant complains of the alternative finding of the trial court in the event the contract being construed is ambiguous. We have concluded, as did the trial court, that the contract is not ambiguous and the point is overruled.

■ By point 5 appellants complain of the action of the trial court in concluding that appellants were estopped to deny liability on each of the net 22,181 mufflers sold or caused to be sold by the Corporation during the period of July 1, 1949 to date of dissolution of said Corporation. As above pointed out, the Corporation treated the mufflers as coming within the patent at all times and no changes in the design of mufflers sold were made for more than 60 days prior to July 11, 1949 until the date of dissolution. There is no evidence that any change of design was made that did not come within the research of Kliewer. Appellants knew at all times that the mufflers manufactured and sold did not come within the exact terms of the patent or improvement patent. Appellants contracted with Hancock to manufacture mufflers under the letters patent, improvement patent, research or Deviation Thereof, secured Kliewer's written consent thereto, and then continued to manufacture, package and sell such mufflers after the letter of July 11, 1949 was written, and stencilled upon the cartons the words "Patented" and "Free-Flow" right on down to the date of dissolution, and never returned the letters patents. We think the conclusion of the trial court was unquestionably correct and the authorities cited in the case note of Strong v. Carver Cotton Gin Co., 14 L.R.A.,N.S., 274, support this contention. See also Dwight & Lloyd Sintering Co. v. American Ore Reclamation Co., D.C., 44 F.Supp. 401; Cold Metal Process Co. v. McLouth Steel Corp., 6 Cir., 170 F.2d 369; Wilcolator Co. v. Robertshaw Thermostat Co., D.C., 26 F.Supp. 255; Lathrop v. Rice & Adams Corp., D.C., 17 F.Supp. 622; Kant-Skore Piston Co. v. Sinclair Mfg. Corp., 6 Cir., 32 F.2d 822, certiorari denied 281 U.S. 735, 50 S.Ct. 249, 74 L.Ed. 1150; Baker Oil Tools v. Burch, 10 Cir., 71 F.2d 31.

■ We also point out that in the event the mufflers manufactured and packaged in cartons stencilled "Patented" did not come within the terms of the patent, improvement patent or research, and the appellants knowingly labeled them as such, they were violating Secs. 287 and 292, 35 U.S.C.A.

By point 12 appellants complain of the action of the trial court in concluding that the mufflers sold or caused to be sold by the Corporation during the period July 1, 1949 to date of dissolution of said Corporation were the equivalent of mufflers within the technical scope of Kliewer's patent, application for patent and research within the doctrine of equivalents and therefore Kliewer under the agreement of July 30, 1947 was entitled to royalty on those mufflers in the same manner as though they were constructed precisely within the technical scope of such patent, application and research. We think what we have heretofore said renders this point immaterial, or conclusively disposes of same. At any rate, the conclusion reached by the trial court is supported by the doctrine of equivalents as set out in 69 C.J.S., Patents, §§ 209–211, including, pp. 712–720, and the authorities cited therein.

■ In point 9 appellant makes the following abstract statement: "The contract of July 30, 1947 is in violation of the antitrust laws of Texas and is therefore void." The propositions thus stated is a matter of affirmative defense and must be pleaded. It was not pleaded and was therefore waived. Rule 94, Texas Rules of Civil Procedure. We will not discuss the question of whether or not the statement is sufficient to raise a point of error. The point is overruled.

Appellants' point 19 is without merit and is respectfully overruled.

Finding no error in the record, the judgment of the trial court is affirmed.

### On Motion for Rehearing.

 Appellants have filed an extensive and able motion for rehearing in this case and have most forcefully challenged our opinion in several respects, one challenge being to our statement that the patent had not been returned to appellee. It is true that the original letters patent were shown to have been in possession of appellee at the time of the trial, but the right to their use was still in appellants and will so remain until such time as they are reconveyed, forfeited or cancelled by judicial decree. The physical possession of the letters patent does not carry with them the right to their use in the face of the license agreement in the record.

Appellants also challenge most forcefully our disposition of their Point 9 which is set out in the foregoing opinion. They contend that the alleged illegality of the contract is fundamental error and may be considered by this court or by the Supreme Court without the matter having been pleaded or the point having been raised, and rely strongly upon the cases of Texas & Pacific Coal Co. v. Lawson, 89 Tex. 394, 32 S.W. 871, 34 S.W. 919, and Ramsey v. Dunlop, 146 Tex. 196, 205 S.W.2d 979, in an opinion dated November 12, 1947, subsequent to the passage of Rule 94.

In the Lawson case the question that the contract violated the anti-trust statutes and was therefore void was not raised by either of the parties in the trial court and was not assigned as error on appeal. The Supreme Court in holding that the contract created a trust within the meaning of the statute and was void and that no action or counterclaim could be founded thereon, regardless of pleading, said [89 Tex. 394, 34 S.W. 920]:

"Counsel for Lawson, in an able argument, contends that this court has no jurisdiction to consider the illegality of the contract, since that question, as indicated in our former opinion, was not raised in the court below, and not assigned as error here. * * * the various claims and counterclaims of the plaintiff and defendant as set up in the pleadings are based upon the supposed rights of the parties growing out of and dependent upon the validity of the contract * * * referred to, and the one preceding it, which was tainted with the same vice. * * * *Parties litigant cannot, by express waiver, induce a court to pass over the illegality of a contract, and administer their supposed rights thereunder, based upon the assumption of its legality;* and certainly a mere omission to notice such vice or bring it to the attention of the court cannot have that effect." (Emphasis ours.)

In Ramsey v. Dunlop, supra, 1947, the Supreme Court, citing the Lawson case said [146 Tex. 196, 205 S.W.2d 983]:

"We shall not undertake to give an all-inclusive definition of fundamental error; but, to the purpose of this case, we do hold that an error which directly and adversely affects the interest of the public generally, as that interest is declared in the statutes or Constitution of this state, is a fundamental error. Our meaning finds illustration in the case of Texas & Pacific Coal Co. v. Lawson, 89 Tex. 394, 400, 32 S.W. 871, 34 S.W. 919. In that case the plaintiff sued for rents alleged to be due under a written lease; the defense was that a correct statement of accounts would show that Lawson owed no rents but was due large sums by plaintiff. Although it was apparent from the petition that the contract violated the anti-trust statutes, that question was nowhere raised by either of the parties. But, after the submission of the case, this court itself raised the question, set aside the submission and referred 'the cause back for oral and written arguments, or either, as counsel may desire.' 89 Tex. 397, 32 S.W. 872. Certain of the assigned errors related to the pleading and proof of efforts on the part of the plaintiff's officers to destroy Lawson's business. Noting the insistence by Lawson's counsel that the parties had nowhere questioned the legality of the contract, this court said in reference to these assigned errors, 89 Tex. 394, 34 S.W. 921: 'If the foundation of the action fails, all pleadings and evidence *tending to support the verdict* are thereby necessarily shown to have been improperly sustained and admitted, and it

would be folly for a court to thereafter undertake to determine, as we are now asked to do, whether such pleading and evidence were properly sustained and admitted upon the assumption of the legality of the cause of action. Parties litigant cannot, by express waiver, induce a court to pass over the illegality of a contract, and administer their supposed rights thereunder, based upon the assumption of its legality; and certainly a mere omission to notice such vice or bring it to the attention of the court cannot have that effect.' * * *

"If our courts, in whom is imposed the judicial power of this state, cannot act of their own motion in such a situation, only because *litigants* whose personal interests are adverse to that public policy *have waived the error,* then the government of this state is indeed impotent. * * *

"Therefore, we hold that it is both the province and the duty of the court of civil appeals to consider the error." (Emphasis ours.)

There is a definite conflict between the holding of the Supreme Court in the Lawson and the Ramsey v. Dunlop cases, and the holdings of the courts of civil appeals in the following cases: Benefit Ass'n of Ry. Employees v. O'Gorman, Tex.Civ.App., 1946, 195 S.W.2d 215, wr. ref., nre; Continental Fire & Casualty Ins. Corp. v. American Mfg. Co. of Texas, Tex.Civ.App., 1948, 206 S.W.2d 669, no writ history; Wilde v. Liedtke, Tex.Civ.App., 1950, 231 S.W.2d 1009, no writ history; Dimmitt v. Dimmitt, Tex.Civ.App., 1954, 263 S.W.2d 648.

We think it advisable to point out these conflicts in view of our statement in the foregoing opinion to the effect that the failure to plead the illegality of the contract waived the defense of such illegality.

In the case of Benefit Ass'n of Ry. Employees v. O'Gorman, supra, the court said [195 S.W.2d 218]:

"We do not see fit, however, to dispose of the limitation question on the ground of invalidity of the policy provision, because

of the state of the pleadings. Appellant pleaded the contract provision in defense of the suit. Appellee did not by replication question the legality of the provision, and therefore, by reason of Rule 94, we doubt if the legality of the provision in question is before us on this appeal. Rule 94 provides in part:

" 'In pleading to a preceding pleading, a party shall set forth affirmatively * * * illegality * * * and any other matter constituting an avoidance or affirmative defense * * *.'

"Before the adoption of the present rules of procedure the illegality might have been noticed at any time, either by the trial court or by the appellate court, but we doubt if we can now do so under the state of the record before us. Reid v. Associated Employers Lloyds, Tex.Civ.App., 164 S.W.2d 584, writ refused; Federal Underwriters Exchange v. Craighead, Tex.Civ.App., 168 S.W.2d 699. We have referred to the possible invalidity of the policy provision lest we might be thought to have construed it as valid."

A conflict between Rule 94 and the Lawson and Ramsey v. Dunlop cases can readily be noted from the quoted part of the opinions and the above-quoted part of the rule.

In the case of Continental Fire & Casualty Ins. Corp. v. American Mfg. Co. of Texas, supra, the court said [206 S.W.2d 672]:

"The point of error relied upon by defendant poses the issue of the illegality of the obligation sued on. Rule 94, Texas Rules of Civil Procedure, requires the defendant to specially plead the illegality of the contract before he can avail himself of that defense. Of course in this venue case defendant has not been called upon to plead the merits of the case. It may also be observed that if plaintiff's petition affirmatively and conclusively shows upon its face the illegality of the transaction upon which suit is based, it becomes a judicial admission and defendant can rely upon it."

In Wilde v. Liedtke, supra, the court said [231 S.W.2d 1010]:

"As we view appellee's pleadings, the evidence and the trial court's judgment, the case it bottomed upon rescission of a contract for failure to comply with warranties which appellant made to appellee at the time of sale. The testimony is sufficient to support the trial court's judgment and the only question before us is as to whether appellant's theory is correct, that is, was the transaction between him and appellee void under Section 53 of the Certificate of Title Act, Vernon's Penal Code, Article 1436–1, which reads as follows: 'All sales made in violation of this Act shall be void and no title shall pass until the provisions of this Act have been complied with.'

"Under Rule 94, Texas Rules of Civil Procedure, the burden was on appellant to not only plead but also prove illegality of the contract. See Reid v. Associated Employers Lloyds, Tex.Civ.App., 164 S.W.2d 584, writ refused; Federal Underwriters Exchange v. Craighead, Tex.Civ.App., 168 S.W.2d 699, writ refused, w. m."

In Dimmitt v. Dimmitt, supra, the court said [263 S.W.2d 660]:

"Since this fraudulent scheme was not pleaded and no issue thereon was submitted to the jury and none requested and since it is not contended that such fraudulent purpose is established by the undisputed evidence it is our opinion that the question presented by appellee is not before us. Rules 94 and 279, T.R.C.P."

Fraud, not illegality, is involved in the Dimmitt case. If the rule requires fraud to be pleaded, then it requires that illegality be pleaded. If the rule means what it says, and must be liberally construed, we can see no escape from pleading any illegality as a defense to any lawsuit, even though the illegality is apparent in the record. Our Rule 94 is Federal Rules Civ.Proc. Rule 8(c), 28 U.S.C.A., except for the second sentence which was added by amendment of March 31, 1941.

There are very few cases cited by the Federal courts on the question here, but the cases cited definitely hold that illegality must be pleaded, as required by Federal Rule 8(c). American Casualty Co. of Reading, Pa. v. Morris, D.C., 51 F.Supp. 889, 896, affirmed, Simon v. American Cas. Co. of Reading, Pa., 4 Cir., 146 F.2d 208. "The defense of illegality must be affirmatively pleaded. Rule 8(c), Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c."

In the case of Charm Tred Mills, Inc., v. Erle P. Halliburton, Inc., 7 Cir., 202 F.2d 294, 297, no writ history, the court in speaking of the requirements of pleading illegality under Federal Rule 8(c) said:

"This illustrates the danger of attempting to try out issues for which there is no basis in the pleadings. Plaintiff points out that a jobber could change its form of organization without losing its mark-up privileges, citing 2 Pike & Fischer O.P.A. Price Service, Consumers Goods Desk Book, p. 11,187. Plaintiff claims that had it been advised of defendant's contention by pleading or otherwise, it could have proved that a partnership with the same name and with the same interests had been a well-known jobbing firm in Chicago since 1934. We hold that defendant, neither having raised this defense in the pleadings nor until after the plaintiff had finished its proof, cannot now assert a violation of that section of the regulation to prevent a recovery upon the contract."

The conflict poses a problem for the Supreme Court and we will not try to reconcile same.

The motion for rehearing is overruled.